[No. 21275. Department Two. December 31, 1928.]

CHARLOTTE HARRIS *et al., Appellants,* v. JOHN STANIOCH *et al., Respondents.*[1]

*Marion Garland,* for appellants.

*Ray R. Greenwood,* for respondents.

[1]Reported in 273 Pac. 198.

PARKER, J.—The plaintiffs, Mrs. Harris and husband, commenced this action in the superior court for Kitsap county, seeking recovery of damages from the defendants, sheriff of that county and two of his deputies, claimed as the result of their unlawful arrest and false imprisonment of Mrs. Harris. The case proceeded to trial in the superior court for that county, sitting with a jury.

At the close of the introduction of evidence in behalf of the plaintiffs, the trial court, in response to a motion made in behalf of the defendants, dismissed the case upon the ground that the plaintiffs' evidence was not sufficient to support a verdict and judgment awarding any recovery by them, the court so deciding as a matter of law. The plaintiffs then moved for a new trial, which motion was denied. From this final disposition of the case, plaintiffs have appealed to this court.

During the evening in question, Mrs. Harris, with her husband and some friends, drove to a rural hall in Kitsap county to attend a dance. They parked their car a short distance from the hall, and were about to proceed to the hall when they were accosted by the two defendant deputy sheriffs. Mrs. Harris testified, on direct examination, as to what then occurred, in part, as follows:

"When we arrived, we parked our car. There was somebody standing there, and just then Mr. Allen [one of the defendants] started searching the men, and when he came up to me I stepped back and told him he couldn't search me, and he was going to search me anyway, and my husband says, 'You leave my wife alone; you can't search her;' and the other deputy [Tanner] came out the other side and he says, 'We can't do what?' and he pulled a gun and Mr. Allen says, 'If you will not let me search you, I will take you to Port Orchard to be searched,' and he took me down to the dance hall; and he asked Mr. Lindquist

[he evidently being in charge there] for somebody to search me, and Mr. Lindquist got his sister and his sister came and searched me. I had money in my pocket and I tried to hand it to my husband, and Mr. Allen made me give it to this lady and then took it himself and returned it to me. Q. Who took you to the hall? A. Mr. Allen. Q. Did you object to being searched? A. I did. Q. Where were you searched? A. All over my body. Q. Whereabouts in the hall? A. In the side of the dance hall. Q. Did anybody see you? A. Yes; there was quite a crowd around there. Q. How did that affect you? A. It was very humiliating."

On cross-examination, she testified in part:

"Q. The idea was, you were willing for a woman to search you? A. I consented to be searched by a woman. Q. Did you walk up to this hall when he told you a lady would search you? A. He said I would have to go to the hall. He told me there was a matron at the hall; he says, 'We will go to the hall and the matron will search you.' Q. You said nothing further about it? A. I was too scared to do anything else."

Another witness testified in part as follows:

"I got out of the car and the first thing I knew somebody [Deputy Allen] came up and hit me on the pockets and went around to the others alongside of me until he got to my sister [Mrs. Harris], when her husband said, 'You can't search the women,' and she told him to keep his hands off her. He kind of got mad and says, 'I will show you whether I can search you or not.' She says, 'You won't search me,' and he says, 'I'll show you whether I will or not,' and my sister told him, 'If anybody searches me it will be a woman,' and Tanner [the other deputy] came running down with a flashlight and a gun out and he says, 'We can't do what? We have the Government back of us.' Q. Do you know that Allen had his hands on her? A. He had. He took her by the arm and he led her part way when she pulled her arm away, when her husband was going to walk with her, and Allen wouldn't let him.

Q. She walked up there herself? A. Yes, but he made her go up there. Q. Who directed the search? A. Allen. This woman took her pocket book and handed it to her husband, and Mr. Allen wouldn't let her give it to him personally."

Two other witnesses testified to the occurrence happening substantially as related by the above quoted testimony. Mrs. Harris and the others became aware of the fact, very soon after they got out of the car, that Allen and Tanner were deputy sheriffs; Mrs. Harris was at no time informed for what purpose she was being restrained of her liberty or being searched. Neither Allen nor Tanner had any search warrant or any warrant of arrest, and they did not make known to Mrs. Harris that they were restraining her of her liberty or going to search her for the commission, or alleged commission, of any felony or any misdemeanor by her. She was not further restrained after the completion of the search.

It is contended in behalf of appellants that this testimony was sufficient to carry to the jury the question of whether or not Mrs. Harris was restrained of her liberty, against her will, to the extent of constituting unlawful arrest and false imprisonment; while it is contended in behalf of respondents, as was held also by the trial judge, that she voluntarily submitted to all that was then done to her by the deputy sheriffs; that is, that it so conclusively appeared by the testimony of herself and her witnesses as to call for the disposition of the case as a matter of law against her.

While the evidence, as it stood at the close of appellants' case, was such as to have warranted the jury in finding against her, we cannot agree to the view that it was such as to call for such a decision by the court against her as a matter of law. In the text of 11 R. C. L. 793, we read:

"In order to constitute a case of false imprisonment it is essential that there should be some direct restraint of the person; but to constitute 'imprisonment,' in the sense in which the word is here used, it is not necessary that there should be confinement in a jail or prison. Any exercise of force, or express or implied threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment. . . . While actual force is not necessary, it is generally held essential that the conduct of the person complained of must show that force will be used to detain the plaintiff, if necessary, or that the person detaining him does so by some legal authority. The essential thing is the restraint of the person. This may be caused by threats, as well as by actual force; and the threats may be by conduct or by words. If the words or conduct are such as to induce a reasonable apprehension of force, and the means of coercion are at hand, a person may be as effectually restrained and deprived of liberty as by prison bars."

This, we think, is the law of this controversy and calls for our decision that appellants were entitled to have their claim for damages submitted to the jury.

We think that it cannot be determined as a matter of law, in the light of this evidence, that Mrs. Harris was not unduly restrained of her liberty, or that she voluntarily submitted to such restraint.

Counsel for respondents invoke our decision in *James v. MacDougall & Southwick Co.*, 134 Wash. 314, 235 Pac. 812. The plaintiff in that case was accosted by an employee of the defendant, who, in effect, accused her of shoplifting and demanded to see in her purse, but did not arrest her or restrain her of her liberty. She voluntarily took him, not he her, to a nearby policeman and then at her own suggestion, with him and the policeman, went to the defendant's office in its store and showed the contents of her purse, re-

sulting in justifying herself. She was not threatened with immediate arrest. Indeed, the evidence did not show that she would have been then arrested had she refused to disclose the contents of her purse, though the evidence did suggest that she might have been thereafter arrested upon a formal complaint and warrant.

We are of the opinion that the trial court erred in withdrawing the case from the jury and deciding as a matter of law that appellants were not entitled to a recovery.

The judgment is reversed, and the cause remanded to the superior court with directions to award appellants a new trial.

FULLERTON, C. J., and MAIN, J., concur.