179 So. 536

**LOWE et al. v. POOLE.**

**8 Div. 811.**

Supreme Court of Alabama.

March 3, 1938.

Douglass Taylor and Thos. J. Taylor, both of Huntsville, for appellants.

Griffin & Ford, of Huntsville, for appellee.

THOMAS, Justice.

The suit in several counts was for personal injury.

The trial was had on counts 4 and A to E, inclusive. The same breach of contract is set up in each count, being substantially that, while plaintiff was riding in a trailer to a motor vehicle provided by defendants for transporting plaintiff to a place of work for defendants, the trailer was overturned by its insufficient attachment to the motor vehicle, whereby she received the injuries for which suit is sought to be maintained, and which injuries were the material and proximate result of the breach of defendants' contract to safely transport plaintiff to the place of work.

The right of affirmative instruction requested by defendants was decided in Poole v. Fletcher, 233 Ala. 54, 57, 169 So. 868, and authorities cited. McMillan v. Aiken et al., 205 Ala. 35, 88 So. 135. There was no error.

The material statement made by Newman Russell, in the first trial, as to what occurred at the truck in which the cotton pickers were supposed to be and were transported to the place of work, was the same in substance as his statement now before us, with the exception of his reference to insurance. This portion of Russell's statement will be referred to below.

On the former trial defendants moved to exclude Russell's statement, which motion was sustained. The ruling of the court was assigned as error and held reversible, and the several decisions on the scintilla rule, as affecting the giving of affirmative charges, are cited. Poole v. Fletcher, 233 Ala. 54, 169 So. 868; Morgan-Hill Paving Co. v. Thomas, 223 Ala. 88, 134 So. 480; McMillan v. Aiken et al., supra.

In the instant record Maddox stated:

" 'I got on the trailer and started to Mr. Fletcher's cotton field at the time Miss Minnie Poole was hurt. I got on the trailer in front of the First National Bank here in Huntsville. I was fixing to get on the truck and I seen Mr. Fletcher and I hollered at Mr. Fletcher and told him to bring his bank book; that he would

need it to pay us off. He throwed his hand up that way (indicating) and went on off. From the looks of the crowd, I reckon there must have been forty or fifty on the trailer.' We started to the field, but I didn't get there. We had a wreck out there. * * * I examined the trailer there afterwards to see how it was attached to the motor. There was a place there for bolts to go through, and the bolts was supposed to have taps on them, but there was no taps at all on them, and when the trailer tilted it come out of them holes; and there was nothing in the world to hold the trailer on; where the bolts went through and where there should have been washers and taps, there wasn't any there, and nothing to keep it from turning over. Taps were missing on both sides.'

"The witness was then asked the following question: ·

" 'The way the trailer was attached to the motor chassis, or motor vehicle, in the event the trailer turned over, would that turn over the motor vehicle?' "

·The witness Mullins in the last trial said:

" 'I was on the trailer that day. I went out to the cotton field of Mr. Fletcher the day before, and picked cotton. I got on the truck over at the corner where the First National Bank is; the same place I ·got on the truck the day the accident happened. The day before when I went out there I picked cotton for Mr. Shelby Fletcher. I saw Mr. Fletcher out there, he paid us off that night. Mr. Newman Russell was in the car with him and showed us where to pick the cotton and weighed the cotton. Mr. Melson went with us in the morning and gave us pick sacks to pick the cotton. The cotton wasn't so good that day. Mr. Fletcher asked us all to come back the next morning. I told him I could get better cotton to pick, and he told me to come back and he would put us in better cotton the next day and furnish a good .way to come. He paid me sixty cents, I believe it was. He said to get all others we could to come out the next day and he would furnish transportation and pay us sixty cents for the cotton. The car Mr. Fletcher was in was right in front of the house. Mr. Poole was out in the field the day before and Mr. Maddox was there. I started back the next day and got on the trailer or truck over here at the bank corner. I took it to be the same trailer. Newman Russell was there that morning that the accident happened.'

"The witness was asked the following question:

" 'Did he say anything?'

"To this question the defendant duly objected, the Court overruled the objection and said that he would let the evidence in for the present, subject to be ruled out if not properly connected. To which action of the Court, defendant then and there duly excepted.

"Answering said question, the witness testified:

" 'He told me if I wanted to go and pick cotton to get on the trailer; that I couldn't get in the cab; that the insurance people would kick, and told me to get on the back end, and then he hollered "Every body get on to go to Fletcher farm to pick cotton." '

"Continuing his testimony, the witness .Fred Mullins testified:

" 'They loaded up. He said the Insurance Company would kick if there was three sitting in the cab and I got on the back. There was a good many got on the trailer that morning and we started out towards the Fletcher farm, the same direction we went the day before, the same route. I can't tell how far we went. We got to where you turn off to go to Capshaw, I believe,—about twelve miles. We were traveling on the highway on our way out there. The trailer turned over when we went to make that turn. * * * Minnie Poole was there.' "

On cross-examination, this witness continued: "Newman Russell told me about the cotton picking job, told me I could get a job picking cotton out there. A good many went out there that morning before the wreck. I saw Mr. Fletcher the morning before the wreck. He told me he wanted me to go to his farm and I could get a job picking cotton. I can't tell you who drove the truck, a white man the day before and a colored man the day of the wreck."

It will be noted that on this appeal the reference in the evidence as to how the truck should be loaded as required by the insurance company was adverted to. · This will be referred to later.

The witness Webb testified as follows:

" 'I was on the trailer the day Minnie Poole was injured. I got on the trailer the day before. It was parked over .here at

the First National Bank the day before when I got on, at the same place I got on the second morning. The day before when I was out in the fields I saw Mr. Shelby Fletcher. He was out there. I picked cotton that day. I reckon Mr. Melson paid me for it that day. Mr. Fletcher set in the front seat and figured it and Mr. Melson was in the back seat. Mr. Fletcher figured the amount due us and Mr. Melson paid us. Newman Russell was there sitting in the back seat beside Mr. Melson. Mr. Fletcher told us to come back the next day and bring all the hands we could the next day; that he would furnish free transportation and for us to get all we could and he would pay us 60 cents per 100. I know Mr. Poole, the father of Minnie Poole. He was standing pretty close when Mr. Fletcher told them all to come back. Mr. Fletcher was talking to all of us. I went to the First National Bank the next morning and got on the trailer, which was parked there waiting for us. Newman Russell was there.'

"The witness was then asked the question:

" 'What did he say?'

"To which question the defendant then and there duly objected, and the court overruled the defendant's objection, to which action of the court the defendant then and there duly excepted.

"Answering such question, the witness says:

" 'He told us all to get on and go to the Fletcher farm; and load up and go to the Fletcher farm.'

"Continuing his testimony, the witness Melvin Webb says:

" 'There was a good many on the trailer, it was pretty full, and we picked up several on the way out towards the Fletcher farm where we went the day before. Looked like fifty or more on the trailer. * * *' "

■ There was no error in ruling on the foregoing evidence tending to show the agency, and the relation of appellants' intestate to the transportation, as stated on the first appeal.

In the recent case of Pittman v. Calhoun, 233 Ala. 450, 172 So. 263, 265, this court said:

"The witnesses were questioned as to what defendant said as to the facts of the occurrence, and that was repeated as a part

of his statement, and promptly excluded with emphasis.

"In Standridge v. Martin, 203 Ala. 486, 84 So. 266, counsel argued such matter to the jury, and there was only a conditional withdrawal, and the sustaining of objection was held not to be sufficient to eradicate the injurious effect. In Watson v. Adams, 187 Ala. 490, 65 So. 528, Ann.Cas.1916E, 565, counsel made persistent effort to prove that attorneys for defendant represented an insurance company.

"It is not every referenee in the testimony to insurance held by defendant which is of such nature that the court should withdraw the case or grant a new trial. Smith Lumber Co. v. McLain, 202 Ala. 32, 79 So. 370; Clark-Pratt Cotton Mills Co. v. Bailey, 201 Ala. 333, 77 So. 995, 996; Smith v. Baggett, 218 Ala. 227, 118 So. 283."

■ There was no motion to withdraw the statement of the witness as to the requirements of the insurance company as to how the truck should be loaded. We are of the opinion that the entire statement of Newman Russell was admissible and that no reversible error is shown with reference to the rulings on his statement.

The effect of the evidence is that, on the day before the injury to appellee, Russell, Melson, and the defendants' intestate were all in the defendants' car, and in his cotton field with the pickers; that defendants' intestate gave instructions with reference to picking cotton on the day the injury occurred; that Russell was in the employment of decedent and gave instructions to the pickers and weighed the cotton; that Melson was in the employment of Fletcher, engaged the truck for transportation of pickers and paid the owner of the truck for the use of same with Fletcher's check; that Russell left the garage with the truck on the day of the injury complained of, and that the truck was loaded with pickers at the same place it was loaded the day before; that Russell gave instructions to the pickers as to where they should sit in the truck. It is also shown that such landlord was there and spoke to at least one of the pickers or the picker spoke to him about payments for cotton to be picked.

■ The owner of the truck testified that he had no control over the truck after it left his place of business and the driver was to go and do as instructed by Russell

and that Russell was not employed by him. Thus the relationship between Melson, Russell, and Fletcher was a question for the jury.

■ When all of the evidence is considered, the question of Bentley Bros. being independent contractors for transportation also presented a jury question, and there was no error in refusing the general affirmative charge on this phase of the evidence. Great A. & P. Tea Co. v. Donaldson, 229 Ala. 276, 156 So. 865; General Exchange Ins. Corp. v. Findlay, 219 Ala. 193, 121 So. 710; Ex parte Board of School Commissioners of Mobile County, ante, p. 82, 178 So. 63.

■ The recognized test of an independent contractor is whether or not the person for whom another is working has control of the agency, character, and prosecution of work in such wise as to come within the decisions as to whether or not there is liability.

There was no error in refusing the affirmative instructions requested in writing by the defendants. A jury question was presented on the fact of negligence, and that of independent contractor, which questions were properly submitted and decided against the defendants.

■ There was no error committed in overruling demurrer to the complaint for the use of the words "engaged or undertook to furnish." The Second Edition of Webster's New International Dictionary defines "undertake" as follows:

"1. To take upon oneself; to engage in; to enter upon; to take in hand; set about; attempt; as, to undertake a task, a journey.

"2. Specif., to take upon oneself solemnly or expressly; to lay oneself under obligation, or to enter into stipulation; to perform or to execute; to covenant; contract.

"3. Hence, to guarantee; be surety for; promise.

"4. To accept or take over as a charge; to accept responsibility for the care of; to engage to look after or attend to; as to undertake a patient or guest."

The complaint was definite and informed the defendant against what he was to defend as for breach of contract.

There was no error in overruling motion for a new trial.

The judgment of the circuit court is, therefore, affirmed.

Affirmed.

ANDERSON, C. J., and BROWN and KNIGHT, JJ., concur.