Krebs *v.* McNeal.

No. 39310 January 3, 1955 76 So. 2d 693

*O. K. Wiesenburg,* Pascagoula, for appellant.

*H. W. Gautier,* Pascagoula; *Barnett, Jones & Montgomery,* Jackson, for appellee.

ETHRIDGE, J.

This is a suit for slander. It was initiated in the Circuit Court of Jackson County by appellee John R. McNeal against J. Guy Krebs, appellant and defendant below. After a lengthy trial the jury returned a verdict for appellee in the amount of $750.00.

## I.

In August 1951 Krebs was serving as sheriff of Jackson County. The second democratic primary for sheriff was being held on Tuesday, August 28, 1951. The two candidates contesting the sheriff's race in the second primary were appellee McNeal and Leo Byrd, who was then serving as a deputy sheriff in appellant's office, and who was the successful candidate in the second primary. Krebs was supporting McNeal's opponent, Byrd.

On Sunday night, August 26th, before the election on next Tuesday, an unknown man made a telephone call to McNeal's home in Pascagoula, and upon being advised that McNeal was not in, he asked McNeal's sister-in-law, who had answered the telephone, to tell McNeal that "Roy Cumbest wants to see him tonight without fail." When McNeal came home around midnight, he was advised of this message from Cumbest, a member of the county board of supervisors, so McNeal got in his car, a 1950 two-door Pontiac, and drove alone the 18 miles to Cumbest's home in Wade. Cumbest was in bed, and upon being awakened advised McNeal that he had not called him or asked him to come out. McNeal stayed a short while at Cumbest's place, and then drove back south on the River Road. At a point 4 or 5 miles south of Cumbest's place, a car approached McNeal from the rear. He heard gun fire, put on the brakes on his car, swung it to the right, and the front part of the car stopped in the ditch, with the left rear wheel a foot or two on the blacktop pavement. McNeal testified that shots continued to be fired from the other car, and that he jumped out of the right hand door and went over a barbed wire fence to the west of the highway and through the swamp. This shooting occurred about 600 feet south of the farm home of Marvin Yawn. McNeal said that after he had crawled through the fence and had run into the swamp, the car occupied by the unknown person or

persons who were shooting at him started up and drove on down the highway.

McNeal went north through two or three other barbed wire fences and to the Yawn's home. Mr. and Mrs. Yawn testified that their daughter awakened them, saying that she had heard shots on the highway; that they heard about ten shots after they were awakened; and that thereafter they heard a car pull off from a stop and drive on down the highway. The Yawns took McNeal inside their home. He was not shot, but had been severely scratched by the barbed wire on his left leg, and his trousers, shirt and tie were torn in numerous places from crawling through the barbed wire fences. He was wet from having gone through the creek. Mr. Yawn then drove McNeal to the home of Cumbest, but in the meantime Sheriff Krebs, appellant, had been contacted about the shooting, and he and county patrolman Owen Davis were driving north in Davis' patrol car toward the scene of the shooting. About one mile south of where the shooting occurred, they met a car driven by Alvin Hester and occupied by Yawn and McNeal coming south to the Jackson County Hospital. Both cars stopped close together, and Davis got out and inquired briefly of McNeal about the shooting.

The car occupied by McNeal then proceeded to the hospital and Krebs and Davis drove on to where the McNeal car had been stopped in the ditch. Krebs and Davis both testified that they got out of the patrol car and with flashlights examined McNeal's car, and that it had no bullet holes or marks in it at that time. This, apparently, was around 3:30 A. M. on Monday morning, August 27. They turned off the radio, lights, and switch on the car, and backed it out of the ditch. They testified that they saw no skid marks on the highway when they arrived at the McNeal car. Krebs then drove the McNeal car, followed by Davis, to Moss Point, and parked it in front of the Faia Funeral Home, leaving the keys under the sun visor. They then drove to the

hospital, and Davis but not Krebs went inside to advise McNeal where his car was. Hester and Yawn were then at the hospital with McNeal. McNeal was discharged from the hospital later that day.

Around 4:30 A. M. Monday morning, Yawn and Hester went by the front of the Funeral Home to look at the car and to get some campaign cards which McNeal had left in it. It was beginning to be daylight, and at that time Hester and Yawn both testified that they saw on the back of the car to the rear of the driver's seat at least four bullet holes and marks, two of which had pierced the steel plating. Nelson Grubbs, a ballistics expert from Alabama, testified that at least four bullets went into the car, striking it at different angles veering to the left, and that either the car or the person shooting at it was moving when the shots were fired. J. D. Strahan, night watchman at Moss Point, testified that in making his rounds the car was not in front of the Funeral Home at 4:00 A. M., but that he saw it there at 4:30 A. M. when Hester and Yawn discovered the bullet holes, which were in the car at that time. W. C. Dobbs and Johnson Ware also testified that the car had bullet holes in it around the same time. When Hester, Yawn, and McNeal passed McNeal's car while driving to the hospital early that morning, shortly after 3:00 A. M., Yawn and Hester said that they stopped and turned off the lights, but did not then examine the car to ascertain whether there were any bullet holes in it. A few minutes thereafter Krebs and Davis arrived at the scene of the shooting, and drove the car to Moss Point, parking it in front of the Funeral Home.

The slanders of plaintiff by defendant, which were charged in the declaration and which are the basis of this suit, occurred on the day following the night of the shooting, namely, on Monday, August 27th, which was the day before the second primary election. Yawn testified that around 1:30 P. M. Monday afternoon, in front of Burnham's Drug Store in Moss Point, Krebs was talk-

ing to several men about the matter and that Krebs was "telling them that John had ran up there and made a big hoax—tried to scare all of them about somebody was shot at and running to my house and there wasn't nothing to it . . . He said that he had ran his car off up there and done a lot of shooting and run up to my house and tried to scare all of us and there wasn't nothing to it . . . Well he was telling them that there wasn't nothing to it and that John McNeal had ran his car up there and done a lot of shooting and there wasn't nothing to it. It was a frame up."

Yawn again testified concerning what Krebs said on this occasion: "He was saying John McNeal had shot his car up up there and he had investigated it thoroughly and there wasn't anything to it. He had framed it up and ran up to our house and—

"Q. And scared you people?

"A. He had—

"Q. Scared you and your family, is that what you said he said?

"A. Yes."

Three other witnesses testified concerning what they heard appellant say about the shooting incident in front of Burnham's Drug Store: DeLashnet, Elzie, and Roberts.

Thomas DeLashnet said that on Monday afternoon, in front of Burnham's Drug Store, he heard Krebs state to a good many people who were listening to him, including Marvin Yawn, that "it was a hoax, nothing to it, a put-up job"; but that he didn't hear appellant state who did it.

Howard Elzie said that on Monday morning, in front of Burnham's Drug Store, there were ten or twelve people present. He testified:

"Q. What did you hear Mr. Krebs say pertaining to McNeal, if anything?

"A. He said it was a put-up frame and a hoax and a fraud and there wasn't anything to it.

"Q. What was he talking about?

"A. Concerning the McNeal case."

Elzie said that he did not remember hearing appellant call McNeal's name, but that appellant "was just talking about the shooting."

K. W. Roberts testified that on Monday afternoon, in front of Burnham's Drug Store, in Moss Point, Krebs was talking to five or six people. Roberts testified:

"Q. In the back end of a pick-up truck. What was he . . . the talking about?

"A. Oh, discussing the McNeal case.

"Q. You mean the shooting?

"A. That's right.

"Q. What, if anything, did you hear Mr. Krebs say about Mr. McNeal in connection with what happened?

"A. He was trying to sell people on the idea it was a hoax.

"Q. He was doing what?

"A. Trying to sell the people upon the idea that it was a hoax there in Moss Point. . .

"Q. Go ahead. What manner was he using in his statement to the people who were there?

"A. He was talking in a sincere manner.

"Q. And what, actually, did he say?

"A. Well, he just said that the general opinion was that it was a hoax—it was nothing and McNeal perfected —

"Q. What?

"A. That he perfected a hoax.

"Q. Did he say why people were saying that McNeal had done that?

"A. He did not."

The second count of the declaration contained charges with reference to an alleged slander of appellee by appellant on Monday morning, August 27, being statements made by appellant to Easton King, the editor of a Pascagoula newspaper. King testified that he asked Krebs about the shooting, and that appellant told him

that "it was a put-up job and a hoax done by McNeal to influence the election"; that there were no bullet holes or marks in McNeal's car, and that if there had been he would have seen them; that he (Krebs) would swear that it was a hoax. King's news story in his newspaper quoted Krebs as saying that he believed the shooting was a hoax, because he saw no bullet holes in the back of the car when he first examined it that night, but it did not say that Krebs stated that McNeal had done it. In response to questions as to why he did not report in the article that Krebs said that McNeal had perpetrated the hoax, King stated that Krebs had actually told him that, but that in writing a story he had to keep in mind the libel laws.

## II.

With reference to whether there were bullet holes and marks in the rear of McNeal's car when Patrolman Davis and Sheriff Krebs first saw it that Monday morning around 3:30 A. M., both Krebs and Davis testified, as previously stated, that they examined the car with the aid of a flashlight before they pulled it out of the ditch and took it to town, and that they saw no such bullet holes or marks in it. That was in the nighttime. To rebut that testimony, and to make an issue for the jury as to whether the car actually had bullet holes and marks in it from the pistol shots fired at appellee and when appellant and Davis first saw it, and therefore whether appellant's statements about appellee were true or false, appellee testified about the pistol being fired at him. Mr. and Mrs. Yawn testified that they heard about ten shots shortly before appellee came to their house and a car drive off down the highway. They said that on the next morning the barbed wire fences through which appellant crawled had torn pieces of his clothing on it; yet appellant said he saw none there. They and McNeal stated that appellant never made any investigation of the incident by asking them about their knowledge of the

facts. Grubbs, the ballistics expert, stated that at least four bullets went into the car and that they struck at different angles, going to the left; that either McNeal's car or the person firing the shots was moving to the left as the bullets were fired into the car.

Hester, Yawn and J. D. Strahan, night policeman at Moss Point, saw bullet holes in the car at 4:30 A. M. Strahan further said that the car was not in front of the Funeral Home at 4 A. M., but that it was there when he made his next round at 4:30. Krebs said it was put there around 4 A. M. Johnson Ware lived with his family on the front side of the second floor of the Funeral Home about 25-30 feet from the sidewalk next to which McNeal's car was parked. He said that the hospital called Perkins at the Funeral Home around 3:30, and that Perkins went to the hospital; that between 4 to 4:30 A. M. he heard car doors slamming and saw a light tan car pulling away with a siren mounted on top; that it was a county patrol car. Ware said that after the car was placed in front of the Funeral Home, he remained in his apartment upstairs and near the car, that he was "most positive" that there were no shots fired around there that morning, and that he was sure he would have heard them if they had been fired. Earl Turnage lived on the street parallel to and north of the street on which the Funeral Home was situated. His house backs up to the Funeral Home. His bedroom is about 125 feet from it. He testified that he left his home about 5 A. M. and when he got around to the front of the Funeral Home several people were looking at the McNeal car and at the bullet holes in the back of it; that if any pistol shots had been fired around the car before he got up that morning, they would have disturbed him; and that he did not hear any shots fired. Strahan, the night policeman at Moss Point, said that between 4 and 4:30 A. M. he was at the city hall about 175 yards from the Funeral Home; that he was close enough to where he could have heard any pistol shots, and between those times he did not hear

any. After they got the car, appellant and Davis testified that they drove it straight to the Funeral Home, and apparently it was parked in front of the Funeral Home at or shortly before 4 A. M.

Under this state of the record, we think that the conflicting testimony made an issue of fact for the determination of the jury, as to whether in fact the bullet holes and marks were in the rear of McNeal's automobile when Sheriff Krebs and Patrolman Davis got it that night on the highway and out of the ditch around 3:30 A. M. and when they left it at the Funeral Home around 4 A. M. And therefore it was a jury question whether appellant's statements about appellee were true or false. The jury could well have concluded that although Krebs and Davis were testifying honestly and to the best of their belief about there being no bullet holes when they first examined the car by flashlight in the nighttime on the highway, yet in view of the location of the marks, the darkness, and the other circumstances, the officers were mistaken in concluding that the McNeal car had no bullet holes and marks in it when they first saw it.

■■■ The verdict is supported by the weight of the evidence. The jury was warranted in finding on conflicting evidence that there were bullet holes in the car when the officers first picked it up on the highway, and that no bullet holes were thereafter put in it by anyone; and that the statements made by appellant on both counts of the declaration were slanderous and false, and were made maliciously. Nor was there any abandonment by appellee of the charges in count two of his declaration, concerning statements made by appellant to King, the newspaper editor. In fact, appellant obtained an instruction defining what appellee must prove to recover on that count. The jury was also justified in finding that the words uttered by appellant charged appellee with committing crimes and offenses against the law of the State by perpetrating a fraud and a hoax on members of the public by illegally shooting firearms and by

fraudulently attempting to influence a public election; and that appellee was damaged thereby.

## III.

Appellant argues that the trial court erred in refusing to grant him a peremptory instruction; that his statements concerning the shooting and McNeal were made by him as an officer of the law and were absolutely privileged, because they were made in good faith as a result of his official investigation of the crime. ██ But an officer of the law has no absolute privilege for any and all comments which he makes. An absolutely privileged communication is one made in the interest of the public service or the due administration of justice, and in practical effect is limited to legislative, judicial and military proceedings. Hardtner v. Salloum, 148 Miss. 346, 354, 114 So. 621 (1927); Grantham v. Wilkes, 135 Miss. 777, 784, 100 So. 673 (1924). The applicable privilege might be described as qualified. The correct rule is set forth in 33 Am. Jur., Libel and Slander, Sec. 169, pp. 161-164, where it is said: "Although there are a few decisions to the contrary, the great weight of authority supports the view that publications dealing with political matters, public officers, and candidates for office are entitled to a measurable privilege by reason of the public interest involved therein. The principal limitations upon the rule are that the statements must be within the bounds of fair comment and must not be motivated by actual malice . . . The rule does not, however, place such persons wholly without the protection of the law, and although there is authority to the contrary, it is generally held that accusations of crime, dishonesty, fraud, corruption, immorality, etc., and imputations of dereliction of duty, favoritism, or misconduct in office, are not privileged. Many authorities take the position that no privilege attaches to mere insult or abuse, or to remarks that tend to impugn one's private character or to bring him into con-

tempt . . . a majority of the courts appear to adhere to the view that the doctrine of privilege does not extend to misstatements of fact, and that any defamatory publication is actionable if false, regardless of the question of the good faith or reasonable belief.''

 Appellant exceeded his qualified privilege. The persons to whom he communicated the slanderous statements were a group of citizens on the street and a newspaper reporter. They had no corresponding interest or duty in the investigation of crimes, such as would have existed if the communication had been made, for example, to a deputy sheriff. 33 Am. Jur., Libel and Slander, Sec. 167, states the proper test: ''One is privileged to publish the actual facts as to the commission of a crime, and the facts as to the arrest and charges made against a person suspected of the crime, provided the statement does not go further than a mere report of the news by making charges, directly or by inference, insinuation, or assumption, that the person arrested is guilty of the crime. If the account does go beyond a mere narration of the transaction recounted and makes injurious reflections on the private or business character of a party to the transaction, it is actionable if untrue.'' Here appellant went further than a mere report of the facts and charged that appellee had committed a fraud to influence an election. Interesting discussions of the criteria pertinent to whether a defendant had exceeded a qualified privilege are in the following cases: Montgomery Ward & Co., Inc. v. Skinner, 200 Miss. 44, 62-65, 25 So. 2d 572 (1946); Hines v. Shumaker, 97 Miss. 669, 686-688, 52 So. 705 (1910); Hodges v. Cunningham, 160 Miss. 576, 581, 135 So. 215 (1931); Louisiana Oil Corporation v. Renno, 173 Miss. 609, 620, 157 So. 705, 98 A. L. R. 1296 (1934); Love v. Commercial Casualty Insurance Co., 26 Fed. Supp. 481 (U. S. D. C. Miss. 1939). See also Newell, Libel and Slander (4th ed. 1924), Sec. 394, p. 418. These conclusions are consistent with the principles stated in I. C. R. R. Co. v. Wales, 177 Miss. 875, 885, 179 So. 536

(1936). Catron v. Jasper, 303 Ky. 598, 198 S. W. 2d 322 (1946), cited by appellant, deals with statements by a sheriff to his deputy and is not pertinent here.

## IV.

The trial court did not err in permitting appellee to file the voluntary amended bill of particulars on Jan. 27, 1953. In April 1952 defendant filed a motion for bill of particulars, and it was sustained by the circuit court. Several weeks thereafter plaintiff complied with that order by filing a bill of particulars stating that certain named persons would testify that they heard the defamatory statements made. In November 1952 defendant filed a motion to require plaintiff to make more specific his bill of particulars. This motion was overruled. On January 27, 1953, plaintiff filed voluntarily an amended bill of particulars in which he detailed certain additional witnesses who would testify as to several statements made by defendant about plaintiff before and after the slanders sued on, for the purpose of showing malice. The court's order overruling defendant's motion to strike the voluntary amended bill of particulars was in effect an order permitting it to be introduced. Moreover, the statements set forth therein for the purpose of showing malice were not barred by the one year statute of limitations on slander suits, Code of 1942, Sec. 732, since they were not being sued on in this action, but were offered solely for the purpose of showing malice. Appellant obtained two instructions advising the jury that these statements were solely for the purpose of showing malice. Furthermore, unless plaintiff had filed this voluntary bill, he would not have been able to introduce evidence on the matters, under Code Sec. 1499.

We find no error in admitting the testimony of DeLashnet, Oliver and Monk concerning other statements of Krebs about McNeal before and after the shooting. This testimony refers to words on the same subject and

of similar import to those charged in the declaration and bills of particular, and were relevant to appellant's state of mind and the issue of malice. ■■■ The rule, recently restated in Tipps Tool Co. v. Holifield, 67 So. 2d 609, 615-616 (Miss. 1953), is that evidence of other words of similar import published of and concerning the plaintiff by the defendant either before or after the utterances sued on is admissible for the purpose of showing malice. Scott-Burr Stores Corporation v. Edgar, 181 Miss. 486, 506-507, 177 So. 766 (1937) ; 33 Am. Jur., Libel and Slander, Sec. 269. The testimony of DeLashnet and Oliver comes clearly within that rule. When the testimony of Monk is considered along with the declaration, with particular reference to the charge that defendant was a "bitter political enemy" of plaintiff working actively to defeat him in the sheriff's race, it sufficiently complies with that rule.

■■■ The trial court did not err in permitting the newspaper editor, Easton King, to make the voluntary statement complained of to the jury, since it was an explanatory response of the witness to the cross-examination. ■■■ 70 C. J., Witnesses, Sec. 730, p. 573, states the pertinent rule : ''Where a question is put to a witness which cannot be answered without including a statement of fact as explanation, or which in the exercise of the sound discretion of the court may be answered together with an explanation of the answer, as where such explanation is illuminative of a material point or necessary to avoid an impression unfavorable to the witness, the necessary or proper qualification of the answer cannot be complained of. The refusal to permit such explanation may be error. A witness, it has been stated, is ordinarily permitted to explain his answer where the question calls for either yes or no.''

## V.

■■■ Appellant complains of the refusal by the trial court of three instructions requested by him. Instruc-

tions No. 13 and 14 required the jury to believe that Krebs had "expressly charged" McNeal with perpetrating the hoax, and told them that no inference could be drawn that the words were directed against McNeal, unless the plaintiff proved that defendant had "expressly charged" plaintiff with perpetrating the hoax. These were correctly refused, because whether the slanderous words used referred to the plaintiff may be determined either by an express reference to the plaintiff, or by reasonable inferences from references to facts and circumstances in the utterance. 33 Am. Jur., Libel and Slander, Secs. 89 and 263. And instruction No. 11 refused defendant is also objectionable for that same reason, stating to the jury that it must believe that the defendant charged the plaintiff McNeal with being the person perpetrating the hoax, the terminology indicating that defendant must have expressly charged McNeal with being the perpetrator. That this is the proper construction of it is indicated by appellant's statement in his brief that Instruction No. 11 is substantially the same in context as instructions No. 13 and 14, also refused and referred to above. ■■ Moreover, it was for the jury to determine what should have been reasonably understood by the persons present. See Montgomery Ward & Co., Inc. v. Skinner, 200 Miss. 44, 66-68, 25 So. 2d 572 (1946). Appellant got ample instructions submitting properly his theory of the case and what plaintiff must prove in order to recover.

■■ The trial court granted plaintiff the following instruction: "The court instructs the jury, for the plaintiff, that statements made by a law enforcement officer to member of the public about his investigation of an alleged crime are not privileged and do not excuse the officer making such statement of liability if such statements are false or are made with malice or are made with intent of doing injury and damage to the party about whom they are made." The first part is correct through the word "privileged." Statements made to

members of the public are not within the area of the qualified privilege. However, the first ''or'' in the clause beginning with the phrase ''if such statements'' is improper, since the plaintiff had to prove both the falsity of the statements and malice. Perhaps that first ''or'' was a clerical error, but nevertheless the instruction is erroneous. However, appellant got fifteen instructions and plaintiff seven, and practically all of them submitted to the jury in clear and unequivocal terms the correct principle that the plaintiff must prove both that the statements were false and that they were made with malice. Hence we think that the giving of the quoted instruction was harmless error on this record, where the great weight of the evidence supports the jury's verdict, and where appellant, as well as appellee, obtained numerous correct instructions. Rule 11, Miss. Supreme Court (1953).

Affirmed.

*McGehee, C. J.,* and *Lee, Kyle* and *Holmes, JJ.,* concur.