## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 95-CA-00399-SCT

*ACY EASON*

*v.*

*FEDERAL BROADCASTING COMPANY d/b/a*
*WDAM-TV*

| | |
|---|---|
| DATE OF JUDGMENT: | 12/12/94 |
| TRIAL JUDGE: | HON. BILLY JOE LANDRUM |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JOSEPH E. ROBERTS JR. |
| | MARVIN OLIVER OATES |
| ATTORNEY FOR APPELLEE: | S. CHRISTOPHER FARRIS |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND REMANDED - 7/17/97 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 8/7/97 |

**BEFORE PRATHER, P.J., BANKS, AND SMITH, JJ.**

**PRATHER, PRESIDING JUSTICE, FOR THE COURT:**

### I. STATEMENT OF THE FACTS AND CASE

¶1. On February 9, 1992, Acy Eason shot and killed Preston Tanner, a competitor of his in the propane gas business, in the front yard of Eason's home. WDAM-TV, Channel 7 in Hattiesburg sent a reporter, Steve Williams, and a videographer to cover the story. The news story regarding this incident was telecast by WDAM on February 9 and 10, 1992 and once again on June 23, 1992. The portion of the telecast which led to the instant lawsuit reported that Tanner had been killed outside his own home rather than outside Eason's home. The telecast contained footage of a crime scene outside a house, and the February 9 report stated specifically that "Tanner was shot outside his home in the Pecan Grove Community Sunday evening apparently during an argument." The February 10 report similarly repeated this error. Eason contends that the true facts of the fatal incident are that Tanner went to Eason's house while drunk, scaled his fence, and that Eason shot Tanner in self-defense. Eason was charged with manslaughter but was acquitted.

¶2. On Feb. 11, in response to the previous days' telecasts, Bill Jones, a friend of Eason's, called WDAM to advise them that their reporting of the incident had been inaccurate. Jones spoke with Jim

Cameron, the station manager, but WDAM performed no follow-up investigation of the story. After the June 23 telecast, a letter was mailed to WDAM by Marvin Oates, one of the attorneys for Eason, advising them of the allegedly false and defamatory nature of the telecasts and demanding a retraction. On July 16, 1992, Samuel E. Farris responded on behalf of WDAM that it was their position that the information in question was secured from a public official in Jones County and that the news had been reported fairly and impartially and that no retraction was called for under these circumstances.

¶3. Eason filed suit against WDAM on September 15, 1992, alleging that he had been defamed by the reporting in question. In response to the complaint, Steve Williams, the reporter who had broadcast the stories, contacted Jones County Coroner Joyce Perrett to verify the accuracy of the telecast. Mr. Williams testified that Perrett confirmed the accuracy of the report, but Ms. Perrett testified that she never informed Williams that the incident had occurred outside of Tanner's house. The jury returned a verdict for WDAM and Eason appealed, asserting errors in the instructions given to the jury as well and possible misconduct on the part of the jury.

## II. <u>LAW</u>

### A. The trial court erred in granting Jury Instruction 3.

¶4. Eason argues that Jury Instruction No. 3 was improper in that it does not accurately state the law of defamation as applicable to the present case. Instruction No. 3 reads as follows:

> An absolutely privileged communication is a communication which would be actionable as defamatory except that it was made in the interest of the public service or the due administration of justice and was reasonably relevant and pertinent thereto. It is a question of law whether an absolute privilege exists, but it is a question of fact whether the privilege has been exceeded.

> If you find from the preponderance of the evidence in this case that the words spoken by the defendant, whether defamatory or not, were reasonably pertinent and relevant to report in the news of the death of Preston Tanner, then your verdict shall be for the defendant.

¶5. This Court agrees with Eason that the trial court's granting of Instruction 3 constitutes reversible error. The defense of "absolute" privilege generally refers in the defamation context to statements made by public officials such as legislators and judges in the performance of their official duties. 50 Am. Jur. 2d § 275 notes that the defense of absolute privilege is "practically limited to legislative and judicial proceedings and other acts of the state, including communications made in the discharge of a duty under express authority of law."

¶6. WDAM responds as follows:

> Plaintiff specifically argues that the instruction involving an absolutely privileged communication was misleading to the jury and preemptory in nature. However, it is clearly established in our law that `one is privileged to publish the actual facts as to the commission of the crime, and the facts as to the arrest and charges made against the person suspected of a crime, provided the statement does not go further than a mere report of the news by making

charges, directly or by inference, insinuation or assumption that the person is guilty of a crime. (citing 33 **AM. Jur.** "Libel and Slander" 167§ ; *Krebs v. McNeal*, 76 So.2d 693, 699 (Miss. 1955).

¶7. WDAM's discussion of the reporter's privilege ignores the fact that Instruction 3 deals with the totally distinct absolute privilege. WDAM provides a correct recitation of the reporter's privilege, but the reporter's privilege is merely a qualified privilege. In addition, as stated above, the reporter's privilege only grants a reporter the privilege to report *accurately* regarding the events in question.

¶8. The entire basis for the lawsuit in the present case is that the report in question was *inaccurate* as it pertained to the location in which the shooting occurred, and the reporter's privilege accordingly does not apply under the present facts. This Court noted in *Whitten v. Commercial Dispatch Pub. Co., Inc.,* 487 So. 2d 843 (Miss. 1986) that:

> Finally, we reject he defendant's argument that the newspaper is protected by the qualified privilege to publish matters of public concern. While a newspaper publishing company is granted some leeway in its reporting, they may not misstate the facts or otherwise misconstrue the truth.

*Whitten*, 487 So.2d at 846.

¶9. It is clear that Instruction 3 did not merely mislabel the applicable privilege as being an absolute one; to the contrary, the instruction misstated the applicable law in such a manner as to deprive Eason of a fair trial. As noted earlier, the instruction states that, as long as the statements made in the report "whether defamatory or not, were reasonably pertinent and relevant to report in the news of the death of Preston Tanner, then your verdict shall be for the defendant." Truth is an absolute defense to a defamation lawsuit in Mississippi, and it defies reason that a false statement could be "pertinent" or "relevant" in the reporting of an event. *Daniels by Glass v. Wal-Mart Stores, Inc.*, 634 So.2d 88 (Miss. 1993).

¶10. As long as Eason is considered a private figure, that a negligence standard of care applies in the present case regarding the false statements made by WDAM. That is, the jury should have been required to determine whether or not the station was negligent in the manner in which it obtained the false information regarding the location of the incident. The station asserts that it received the information through the county coroner, although the coroner denied that she misinformed the station's reporter that the shooting occurred at Tanner's house. The present case thus involves in large part the jury's resolution of the fact issue of whether the testimony of the reporter or the coroner is more credible.

¶11. At any rate, the station clearly enjoyed no absolute privilege for its statements and this Court concludes that the present case should be reversed and remanded for a new trial. This Court finds it unnecessary to consider the remaining issues on direct appeal.

### III. CROSS-APPEAL

**A. The trial court erred in not finding Acy Eason to be a vortex public official.**

¶12. WDAM argues on cross-appeal that, in the event that this Court decides to reverse and remand

for a new trial, this Court should instruct the trial court to find that Acy Eason was a vortex public figure for the purposes of the present case. A finding that Eason was a vortex or limited purpose public figure under the facts of the present case would change the standard of care in the present case from one of negligence to one of malice. That is, under the *New York Times v. Sullivan*, 376 U.S. 254 (1964) decision, WDAM would only be liable for its broadcast if it were established that it made its report with knowledge that the report was false or that it acted in reckless disregard of the truth.

¶13. This Court noted in *Ferguson v. Watkins*, 448 So.2d 271, 277 (Miss. 1984) that

> (W)hen a private citizen injects himself into a matter of legitimate public interest, he incites free expression of public opinion, including criticism. citing *Edmonds v. Delta Democrat Publishing Co.*, 93 So.2d 171 (Miss. 1957). . . . Further, there is within the *Sullivan* doctrine the recognition of the vortex public figure. Such a person is one who is otherwise a private citizen buy who thrusts himself or becomes thrust into the vortex of a matter of legitimate public interest. Citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). A quasi- or vortex public figure must prove actual malice when he brings a defamation action arising out of a matter of legitimate public interest.

¶14. This Court does not find the trial judge to have erred in concluding that Eason was not a vortex public figure under the facts of the present case. 50 AmJur2d "Libel and Slander" § 93 notes that criminal defendants do not become public figures merely because the alleged crime in question was one of public interest and that "to hold otherwise would create an 'open season' for all who sought to defame persons convicted of a crime." This Court would hasten to note that Eason was acquitted of charges of manslaughter arising out of the incident in question, but the fact remains that, at the time of the report in question, the public interest in the shooting incident in question was in regard to a violent act with potential criminal implications.

¶15. This Court deal with a similar issue in *Whitten*, wherein a newspaper sought for the court to infer public official status for criminal defendants charged with illegally transporting cattle across state lines without proper health certifications. *Whitten*, 487 So.2d at 844. This Court noted that the criminal defendants had done "no more than plead guilty to the misdemeanor charge" and that while the report may have been "newsworthy, in our opinion it was not enough to transform them into public figures for first amendment purposes" *Id.* at 845.

¶16. Under the facts of the present case, it can not be said that Eason thrust himself or was thrust into the public spotlight more than any other private citizen who commits an allegedly criminal act which happens to be in the public interest. WDAM notes that Acy Eason was once a candidate for Constable and that Preston Tanner once served as a supervisor, but the fact remains that both men were private businessmen at the time of the incident in question. There is no indication in the record that Eason sought out additional publicity in the wake of the shooting, nor that he otherwise sought to thrust himself into the public spotlight. This point of error is without merit and is overruled.

### B. The trial court erred in allowing the Plaintiff's expert Ken Lefoldt to testify regarding future profits and possible damages.

¶17. WDAM argues that, should this court elect to reverse and remand for a new trial, this Court should disallow the expert testimony of Ken Lefoldt regarding future profits. WDAM argues that the

"entire testimony of Mr. Lefoldt was based upon loss of future profits that were based upon a gross estimate and not a net estimate. . . . To ascertain net profits, a party must deduct certain items of overhead, depreciation, taxes, and inflation. Further, future profits should always be discounted at an appropriate rate to arrive at present value."

¶18. Eason disputes that the aforementioned testimony was improper, but he appears to concede that the testimony of Lefoldt regarding future profits would not be necessary in any retrial on remand. Specifically, Eason states in his brief that "since Mr. LeFoldt limited his damages to twenty-eight (28) months, if this case is retried then all damages would be past and there will probably be no need for testimony regarding future damages in this action." This Court accepts Eason at his word and directs the trial court to disallow the testimony of Lefoldt regarding future profits on remand.

¶19. **DIRECT APPEAL: REVERSED AND REMANDED. CROSS-APPEAL: AFFIRMED IN PART AND REVERSED IN PART.**

**LEE, C.J., SULLIVAN, P.J., PITTMAN, BANKS, ROBERTS, SMITH AND MILLS, JJ., CONCUR. McRAE, J., CONCURS IN RESULT ONLY.**