# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-CA-01480-SCT

*JAY L. JERNIGAN*

*v.*

*MIKE HUMPHREY*

| | |
|---|---|
| DATE OF JUDGMENT: | 5/3/2000 |
| TRIAL JUDGE: | HON. ROBERT LOUIS GOZA, JR. |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | HARRY R. ALLEN |
| | JEANNE WILLIAMS BAXTER |
| ATTORNEY FOR APPELLEE: | S. CHRISTOPHER FARRIS |
| NATURE OF THE CASE: | CIVIL - TORTS-OTHER THAN PERSONAL INJURY & PROPERTY DAMAGE |
| DISPOSITION: | REVERSED AND RENDERED - 03/28/2002 |
| MOTION FOR REHEARING FILED: | 4/9/2002 |
| MANDATE ISSUED: | 5/23/2002 |

**EN BANC.**

**EASLEY, JUSTICE, FOR THE COURT:**

¶1. On October 24, 1997, Mike Humphrey ("Humphrey"), a police officer with the Hattiesburg police department, filed suit in the Circuit Court of Forrest County. The suit arose out of alleged defamatory statements made by attorney Jay L. Jernigan ("Jernigan") and John Does 1, 2, 3, and 4. Humphrey sought damages for reputation, humiliation, mental anguish and suffering and potentially jeopardizing the loss of his employment. The alleged defamatory statements were made in November 1996 to the district attorney's office and to the media.

¶2. On May 15, 1998, Jernigan filed a motion for summary judgment. The trial court denied Jernigan's motion on July 30, 1998. On October 2, 1998, the trial court granted Humphrey's motion to substitute the *Hattiesburg American* and Nikki Maute, a reporter, as John Doe 1 and 2, respectively. On April 25-26, 1999, a trial between Humphrey and Jernigan, as sole defendant, was conducted, and the jury returned a verdict in favor of Humphrey in the amount of $75,000 in actual damages and $150,000 in punitive damages. The jury verdict was solely against Jernigan, and it is from the judgment entered on that verdict

that Jernigan now appeals to this Court.

## FACTS

¶3. This case begins with an investigation into the Jack Diamond (Diamond) estate. Jernigan served at the request of Chancellor Robert Taylor as guardian ad litem for Diamond after Diamond suffered a stroke and later as conservator of his estate. Jernigan held these positions from approximately December 1994 to December 1995, at which time Jernigan resigned his position.

¶4. In the fall of 1996, the newspapers had mentioned the investigation into the Diamond estate. On November 15, 1996, Jernigan spoke to Assistant District Attorney Rex Jones ("Jones") concerning the Diamond estate. The district attorney's office was inquiring about a judge's alleged solicitations of kick backs from the estate in addition to alleged exorbitant fees charged for security services provided to the estate. A few Hattiesburg police officers were hired for the security of the estate. Jones wanted background information on the estate from Jernigan.

¶5. Jernigan testified that at the time the district attorney's office questioned him about the Diamond estate, he was not concerned with any prosecution. Jernigan had turned over all the contents of his files to the district attorney's office. Upon Jernigan's return from the district attorney's office, Humphrey came into Jernigan's law office. Jernigan had previously represented Humphrey in a child visitation case. Jernigan also knew that Humphrey was a friend of one of the police officers involved in the security of the Diamond estate. Jernigan testified that Humphrey came to his office, asked him how well he knew Jones, implied that Jernigan may be indicted and told Jernigan that he had better keep his mouth shut.

¶6. Humphrey testified that Dr. Mike West (Dr. West) heard that Jernigan was to be indicted for the Diamond estate. On November 15, 1996, Humphrey stopped at Jernigan's office and told him that people were saying that Jernigan was going to be indicted over the Diamond estate. Humphrey denied making a threat to Jernigan. Humphrey's wife also testified that she was with Humphrey on November 15, 1996. She confirmed that her husband went to speak to Jernigan while she waited in their car. Dr. West, however, testified that he did not recall a conversation in which he told Humphrey anything about Jernigan possibly being indicted.

¶7. After Humphrey left the office, Jernigan went to the district attorney's office. Jernigan told Jones what had occurred. Jernigan felt threatened and intimidated by what he had been told. Jernigan never made any allegations, never filed charges against Humphrey and never requested that the district attorney's office do anything. Jernigan testified that he had no intention of hurting anyone and felt no malice.

¶8. Later that day, a reporter from the *Hattiesburg American*, a local newspaper, and WDAM, a local television station, contacted Jernigan. When contacted by the reporter, Jernigan confirmed that Humphrey had come to his law office. Jernigan testified that the reporter supplied Humphrey's name and Jernigan only confirmed the visit. Jernigan did not tell the reporter any of the conversations with the district attorney's office or with Humphrey. Humphrey was not charged with a crime.

¶9. On the following day, November 16, 1996, an article in the *Hattiesburg American* was published. The reporter stated that she suggested the name of Humphrey, and Jernigan merely confirmed that Humphrey approached him.

¶10. Jones's testimony was consistent with Jernigan's testimony. Jones testified that Jernigan was not

informed by the district attorney's office that they were issuing a press release concerning the Diamond estate. The district attorney's office did not inform Jernigan that it was launching an investigation into Humphrey's statements to Jernigan. Jones testified that Jernigan came to his office and stated that he felt threatened and intimidated. Jones stated that Jernigan was upset with him (Jones) but Jernigan did not speak badly about Humphrey. The jury found in favor of Humphrey and awarded him actual and punitive damages.

## **DISCUSSION**

¶11. On appeal, Jernigan challenges the legal sufficiency of the evidence in this defamation case. Humphrey failed to prove the first element of defamation; and therefore, the evidence is not sufficient to support the jury verdict. The trial court ruling as to legal sufficiency is reversed and rendered.

¶12. The standard of review for a denial of a directed verdict, peremptory instructions and a motion for a judgment notwithstanding the verdict is the same. ***Steele v. Inn of Vicksburg, Inc.***, 697 So.2d 373, 376 (Miss. 1997).

> Under this standard, this Court will consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, we are required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required. The above standards of review, however, are predicated on the fact that the trial judge applied the correct law. ***Id***. (citing ***Sperry-New Holland v. Prestage***, 671 So.2d 248, 252 (Miss. 1993)); ***American Fire Protection, Inc. v. Lewis***, 653 So.2d 1387, 1390-91 (Miss. 1995); ***Misso v. Oliver***, 666 So.2d 1366, 1375-76 (Miss. 1996).

On appeal, when the sufficiency of the evidence is challenged, "this Court properly should review the Circuit Court's ruling on the last occasion when the sufficiency of the evidence was challenged before the trial court." ***Steele***, 697 So.2d at 376 (citing ***Wetz v. State***, 503 So.2d 803, 808 n.3 (Miss. 1987)). In the case sub judice, the last occasion on which the trial court ruled on the sufficiency of the evidence was in denying the JNOV motion.

¶13. This Court has established that in to establish a claim of defamation, the following four elements must be proved:

> (1) a false and defamatory statement concerning the plaintiff;

> (2) unprivileged publication to a third party;

> (3) fault amounting at least to negligence on the part of the publisher;

> (4) and either actionability of statement irrespective of special harm or existence of special harm caused by publication.

*Franklin v. Thompson*, 722 So.2d 688, 692 (Miss. 1998). This Court has held that "truth is a complete defense to an action for libel." ***Blake v. Gannett Co.***, 529 So.2d 595, 602 (Miss. 1988)(citing ***Fulton v.***

*Miss. Publishers Corp.*, 498 So.2d 1215, 1217 (Miss. 1986)).

¶14. "In defamation actions, then, the threshold question with which this Court is faced, is whether the published statements are false. Truth is a complete defense to an action for libel." *Blake*, 529 So.2d at 602. The plaintiff has the burden of proving the falsity of the statement. *Id*.(citing *Reaves v. Foster*, 200 So.2d 453 (Miss. 1967)).

### A. Statement to the district attorney's office

¶15. Jernigan spoke to Assistant District Attorney Jones and the newspaper reporter concerning the Diamond estate. Jones requested background information on the estate. On November 15, 1996, Jernigan went to the district attorney's office and spoke with Jones.

¶16. After the interview, Jernigan returned to his office. Shortly thereafter, Humphrey, stopped by Jernigan's office and spoke with him about the Diamond estate. Jernigan testified that:

> [Humphrey] came into the office. He didn't sit down. There was plenty of chairs for him to sit. He appeared nervous to me from my past knowledge of knowing Mike. He had his hands in his pockets and was kind of moving them and he said, Jay, I've heard that you're going to be indicted on this Jack Diamond Estate- or the estate matter. And he said how well did I know Rex Jones and implied that Rex was going to be the one that was going to indict me, and the next thing he said, Well, you better just keep your mouth shut. And that's what he told me.

¶17. Humphrey confirmed that he went to Jernigan's office after paying a child support payment to the chancery court. Humphrey testified that he spoke to Jernigan telling him that people were saying that Jones was going to indict Jernigan. Humphrey's wife also testified that her husband stated he was going to speak to Jernigan, but she waited in their car. After Humphrey left the office, Jernigan went to the district attorney's office and informed them of the conversation. Jernigan stated that he felt intimidated and threatened by Humphrey's remarks. However, Jernigan made no allegations against Humphrey.

### B. Statement to the reporter

¶18. A reporter for the *Hattiesburg American* spoke with Jernigan later that same day. The reporter mentioned Humphrey's name to Jernigan. Jernigan testified that he confirmed that Humphrey came by his office. However, he refused to reveal the contents of the conversations with the district attorney's office or Humphrey to the reporter.

¶19. On the following day, November 16, 1996, an article in the *Hattiesburg American* read, in pertinent part, as follows:

> Authorities from the State Attorney-General's White Collar Crime Unit will be in Hattiesburg Monday to investigate charges that an off-duty police officer tried to intimidate a witness in a controversial $3 million estate case.

> Just 15 minutes after Attorney Jay Jernigan was questioned by the Forrest County district attorneys the off-duty police officer apparently tried to discuss the case with him. When asked by the *American*, Jernigan confirmed that the officer who approached him was Mike Humphrey.

¶20. As to paragraph one, the reporter testified that Jernigan did not contribute any information. As to paragraph two, the following exchange occurred between defense counsel and the reporter:

Q. Okay. Now, tell me how much of that information - - the exact conversation that took place as you recall between you and Mr. Jernigan about that second paragraph.

A. I don't remember our whole conversation, but I do remember that he confirmed that Mike Humphrey was the Officer involved - - who approached him.

Q. It doesn't say involved, does it? It just says who approached him, doesn't it?

A. No. Who approached him.

Q. Now, at that point in time, did you try to get him to tell you the substance of the conversation between he and Mr. Humphrey?

A. Yes, I asked that question.

Q. What did he tell you?

A. He wouldn't talk about it.

Q. Did you ask him about what he told the district attorney's office?

A. I don't remember specifically all that I asked him.

Q. As a matter of fact, you confirm in your affidavit that he wouldn't tell you what was in the conversation with the district attorney's office either, would he?

A. That's right.

Q. When you spoke with him, who first mentioned the name Mike Humphrey?

A. I did.

Q. So you had that name from another source; is that correct? And I'm not interested in what source.

A. Yes.

Q. You simply asked him if this was the person who approached him in his office; is that correct?

A. Right.

Q. Do you have any reason to believe that that statement that he made to you was not true?

A. No.

Q. Now, is there anything - - any other information in that article, that is Exhibit 3, that came from Jay Jernigan?

A. No.

¶21. Humphrey did not present any evidence to show that the statements made by Jernigan were false or based on false information. Jernigan simply told Jones that he felt threatened and intimidated by Humphrey's remarks. Jones also confirmed that Jernigan had no knowledge that the Attorney General's office would be involved in the investigation, nor that there was to be a press release concerning the case. Likewise, Jernigan simply stated to the reporter that Humphrey approached him. In fact, Jernigan refused to reveal any of the conversation with either Jones or Humphrey to the reporter. Therefore, Jernigan never told the reporter that he felt threatened or intimidated by Humphrey. The newspaper linked the facts of an investigation to Humphrey. Jernigan only stated that Humphrey approached him.

¶22. This Court has repeatedly recognized the common law rule that:

> Any written or printed language which tends to injure one's reputation, and thereby expose him to public hatred, contempt or ridicule, degrade him in society, lessen him in public esteem or lower him in the confidence of the community is actionable per se.

*Ferguson v. Watkins*, 448 So.2d 271, 275 (Miss. 1984). In *Ferguson*, this Court established two restrictions for defamation to be strictly enforced:

> First, the words employed must have clearly been directed toward the plaintiff. Beyond that, the defamation must be clear and unmistakable from the words themselves and not be the product of innuendo, speculation or conjecture.

*Id*. See *Franklin*, 722 So.2d at 692.

¶23. Jernigan responded to questions from an assistant district attorney and a news reporter writing a story and stated two things:

> (1) He stated to the district attorney's office that Humphrey informed him of his (Jernigan's) possible indictment. Jernigan stated that he felt threatened and intimidated.

> (2) He stated to the reporter that Humphrey approached him. This was, and is, an objective fact. Humphrey himself testified that he spoke to Jernigan that same day.

¶24. Jernigan's statements were based on truthful, non-defamatory facts. Further, Jernigan's confirmation that Humphrey approached him was true and based on objective, verifiable facts. At the end of the trial, Humphrey failed to meet his burden. There was no testimony that established that Jernigan's statements were false.

¶25. Humphrey failed to prove the first prong of the elements of defamation i.e., a false or defamatory statement against the plaintiff. Consequently, the evidence is legally insufficient and does not support a finding of defamation. Therefore, a reasonable juror could not have reached a verdict that Jernigan was liable for defamation. Accordingly, this case is reversed and rendered in favor of Jernigan.

## CONCLUSION

¶26. The evidence here was legally insufficient to prove defamation. The first prong of a claim of defamation was not proven in the case before this Court. Accordingly, the judgment entered on the jury verdict of the Circuit Court of Forrest County is reversed, and we render judgment that Mike Humphrey take nothing and

that his complaint and civil action are finally dismissed with prejudice.

¶27. **REVERSED AND RENDERED.**

**McRAE, P.J., WALLER AND CARLSON, JJ., CONCUR. SMITH, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DIAZ, J. PITTMAN, C.J., COBB AND GRAVES, JJ., NOT PARTICIPATING.**

**SMITH, PRESIDING JUSTICE, DISSENTING:**

¶28. I disagree with the majority's conclusion that the evidence offered by Humphrey was legally insufficient to show a false and defamatory statement concerning the plaintiff. I would affirm the judgment entered on the verdict in favor of Humphrey. Therefore, I respectfully dissent.

¶29. As observed by the majority, this Court must consider the evidence in the light most favorable to Humphrey, giving him the benefit of all favorable inferences that may be reasonably drawn from the evidence. *Steele v. Inn of Vicksburg, Inc.*, 697 So. 2d 373, 376 (Miss. 1997). If reasonable jurors, in the exercise of impartial judgment, might have reached different conclusions, this Court must affirm the verdict. *Id.*

¶30. I agree with the majority that Jernigan's statements to the media were not defamatory. I disagree, however, regarding Jernigan's statements to Rex Jones. The majority states that Jernigan's statements to Jones were based on truthful, non-defamatory facts and that Jernigan made no allegations against Humphrey. This might be the case had Jernigan merely told Rex Jones of the contents of his conversation with Humphrey. But Jernigan went a step further -- he stated he felt threatened and intimidated by Humphrey's remarks. While Jernigan's statement that he felt threatened and intimidated might be a truthful fact, reasonable jurors could find that the statement implied that a crime had been committed. The implication was neither truthful nor non-defamatory.

¶31. This Court has held that "[a] statement, even if phrased as an opinion, will not enjoy constitutional protection if the Court concludes that its substance and gist could reasonably be interpreted as declaring or implying an assertion of fact." *Roussel v. Robbins*, 688 So. 2d 714, 723 (Miss. 1996) (quoting *Keohane v. Wilkerson*, 859 P.2d 291, 297 (Colo. Ct. App. 1993), *aff'd sub nom. Keohane v. Stewart*, 882 P.2d 1293 (Colo. 1994)). The majority relies on *Ferguson v. Watkins*, 448 So. 2d 271 (Miss. 1984), in which we stated that defamation "must ... not be the product of innuendo, speculation or conjecture." *Id.* at 275. This principle has not, however, prevented this Court from finding that actionable defamation may be the product of statements reasonably creating in the mind of the hearer the implication that a crime has been committed. *See Journal Publ'g Co. v. McCullough*, 743 So. 2d 352, 360 (Miss. 1999) (holding that whether the overall structure of disputed newspaper articles, especially the prominence of a tagline emphasizing the arguably false fact that the chancery court clerk owned a vehicle seized in a drug bust, could reasonably create the implication in the mind of the reader that the clerk was somehow connected to illegal drug activity was an issue for the jury). *See also McCullough v. Cook*, 679 So. 2d 627, 632 (Miss. 1996) (recognized that an underlying implication drawn from facially true statements may be sufficient to render the statements false).

¶32. It was for the jury to determine what should have been reasonably understood by the persons present when the statement was made. *Krebs v. McNeal*, 222 Miss. 560, 76 So. 2d 693, 701 (1955). Clearly,

members of the district attorney's office interpreted Jernigan's statements as meaning a crime had been committed because they launched an investigation into the incident. Keeping in mind that we are required to give Humphrey the benefit of all favorable inferences that may be reasonably drawn from the evidence, I believe reasonable minds could find that a defamatory statement had been made. I would affirm the verdict of the jury.

**DIAZ, J., JOINS THIS OPINION.**