[No. 36776. En Banc. July 23, 1964.]

IAN KILCUP, *Respondent,* v. THOMAS P. McMANUS *et al., Appellants,* THE PORT OF SEATTLE, *Defendant.**

*Reported in 394 P. (2d) 375.

*Merges, Brain & Hilyer* (*G. Robert Brain* and *George N. Apostol,* of counsel), for appellants.

*William S. Howard,* for respondent.

HALE, J.—To the perplexing problems surrounding community tort liability in this case, we find added complications induced by the obscure doctrine that a public official's community is not liable for torts committed in the performance of his official duties. Plaintiff's claim declares a false arrest and imprisonment against a Port of Seattle commissioner.

A telephone call about noon, April 30, 1960, to his home from the head security guard at the airport told Ian Kilcup he had been fired from his job as a security guard and directed him to remove his personal gear from the airport forthwith and to turn in his commission as a King County deputy sheriff. Kilcup drove to the Seattle-Tacoma International Airport where he had been employed for nearly 2 years as a member of the security guard force and parked his car in the upper driveway. He told a guard standing nearby that he had been discharged and would get a shoping bag for his personal effects and return shortly. The guard said "Okay" and allowed him to park his car at that place, anticipating Kilcup's early return.

Before his employment as a security guard by the Port

of Seattle,[1] Kilcup had acquired more than a rudimentary knowledge of police work. He had served in the Navy as a member of the shore patrol and as a deputy sheriff of Grays Harbor County for 2 years, during which latter assignment he attended a school for police officers conducted by the Federal Bureau of Investigation.

After parking his car, Kilcup got a shopping bag, retrieved his effects from his locker, and went about the airport chatting with and saying goodbye to his friends and fellow employees. Later, one or more of the women working at the insurance counter indicated that he bothered or annoyed them by occupying their attention while they were working, but on this point the record is singularly vague.

Kilcup was in the office of Joseph King, an employee of one of the contract concessionaires, shortly after 2 o'clock when there came a knock on the door. King opened the door and Thomas P. McManus, the principal defendant, walked in without invitation and said, "There you are," finishing the exclamation with a burst of profanity. McManus either tapped Kilcup three times on the shoulder or grasped him by the shoulder—the witnesses disagree on which—and said, "You are under arrest. I am a deputy sheriff," and then accused Kilcup of threatening people who worked in the insurance counter. The tapping on or grasping of the shoulder is the only evidence of physical force shown throughout the entire series of incidents.

At that moment, there came another knock on the door and Robert G. Willis, the senior airport security guard on duty at the moment, walked into the office. McManus said to him, "Here he is. I have placed him under arrest. Don't let him get away." Willis testified that, earlier in the day, McManus had called him on the telephone and directed him to find and hold Kilcup for the sheriff's office. McManus and Willis together had searched areas of the airport for Kilcup and, while Willis had checked the restaurant area,

[1]The Port of Seattle is a municipal corporation which owns, operates, controls and manages the Seattle-Tacoma International Airport (RCW 53.04, et seq.).

McManus had walked down the hall to the office of Mr. King.

The three men, plaintiff Kilcup, defendant McManus and Guard Willis, then walked to the front driveway together where McManus again told Willis to make sure that Kilcup did not get away while he, McManus, telephoned the sheriff. Kilcup says he overheard part of McManus's telephone conversation with someone at the sheriff's office requesting them to send out the sheriff or a sergeant, saying, "I have a man here under arrest I am going to put in jail."

The three men waited at the airport driveway for a few minutes near where McManus had parked an official Port of Seattle car. McManus told Kilcup, designating his official vehicle, "Get in the back seat, sit down and be quiet." Kilcup says he complied with these instructions and that Officer Willis got into the front seat with Commissioner McManus who drove the car. McManus announced that they were driving to the sheriff's precinct station, known by the three men to be located in the hangar of Pacific Northern Airlines about a mile away. Plaintiff says that, enroute, McManus told Willis to keep his eye on "this fat, sloppy creampuff," and that he personally could handle Kilcup with one hand but did not want to undertake it while driving. Willis's testimony substantially corroborated the intendments of this communication, if not the precise language employed in it.

The three men drove in the official Port of Seattle vehicle to the sheriff's precinct station which turned out to be closed. They waited for about 10 minutes when McManus told Kilcup to get back into the car, whereupon they drove back to the airport driveway and again waited about 5 minutes for the arrival of officers from the sheriff's office. Then Sergeant Jack E. Triplett, a thoroughly experienced and seasoned officer in the sheriff's office for King County, arrived and, according to Kilcup's account, McManus told him that he had placed Kilcup under arrest and that he should be taken down town and booked. Sergeant Triplett describes this part of the transaction in this way:

" . . . Commissioner McManus stated that Mr. Kilcup

had been relieved of his duties and that he had created a disturbance over at the insurance counter with one of the girls that was employed there and that he was asked to leave and he refused. He advised me that he [McManus] did have a commission from the Sheriff's department. If I am not mistaken, I believe he showed me a badge. . . ."

Sergeant Triplett told McManus that any employee complaining of a disturbance should sign a complaint before a justice of the peace; later, when the employees at the insurance counter were questioned, Triplett told McManus the name and address of the justice of the peace for that area. McManus insisted, according to Sergeant Triplett, that he take Kilcup to jail but Triplett declined to do so without a warrant. McManus also later insisted, according to Sergeant Triplett, that the deputy sheriff see to it that Kilcup left the airport. Kilcup left the airport at about 5 p.m., claiming false imprisonment for more than 3 hours beginning with his false arrest in King's office around 2 p.m.

That McManus presumed to act under his authority as a port commissioner is seen in the evidence given by another guard. Mr. Alexander E. Muir, one of the security officers and an employee of the Port of Seattle, testified that McManus called him at his home about 6 o'clock that evening and upbraided him for failing to carry out orders that McManus had left with him earlier in the day. At about 3:15 in the afternoon—apparently some time following McManus's first contact with Kilcup—at McManus's insistence, Muir had written into the security guard log a notation that McManus be called on the telephone at any hour of the day or night if Kilcup came back to work. Not receiving any telephone call in accordance with these instructions, McManus called Muir shortly after Kilcup had left the airport to ascertain why the orders left by him had not been carried out.

This narrative of the events comes from the direct and cross-examinations of the witnesses presented by Ian Kilcup, the plaintiff, in support of his claim against Thomas P. McManus and Dorothy G. McManus and their community and against the Port of Seattle for false arrest and impris-

onment. Curiously enough, the defendant McManus, while present at the trial, did not testify nor did he present any witnesses in defense. Of the many possible witnesses, none was called to establish that Kilcup had created a disturbance or bothered or annoyed anyone at the airport or interfered with the performance of any employee's work. At the close of the evidence, the trial court granted the Port of Seattle's motion for dismissal and neither the plaintiff nor McManus and his wife appeal from this order of dismissal although the defendants McManus do note it in one of their assignments of error arguendo. The trial court granted plaintiff's motion for a directed verdict on liability, leaving the question of damages to the jury. From a judgment on the verdict in the sum of $5,000, against Thomas P. McManus and Dorothy G. McManus and their community, the defendants appeal.

Appellants point to the dismissal of the Port of Seattle as a strong basis for relieving them of community liability. If, appellants argue, the Port of Seattle is not liable, neither can the community be held liable because, if McManus was not engaged and acting within the scope and course of his official employment, he was not ipso facto within the scope and course of his duties to the community. They urge, therefore, that the release of the Port of Seattle should operate to relieve the McManuses' community of any liability for his actions toward Kilcup. We think that this claim of error merges with and will necessarily be resolved in the determination of this case.

The evidence, in our view, leaves only two problems as pointed up by numerous assignments of error: (1) Did the court err in directing a verdict for the plaintiff? and (2) Do the facts of the case render the community liable? A third problem coming to our attention from the entire record, but not presented by the parties, raises the question: Shall we adhere to the rule that the community of a public officer or official is immune from his tortious acts committed in the performance of his official duties?

■ First, as to the problem of the directed verdict for the plaintiff, we find no facts and see no inferences deriving

therefrom, even taken in a light most favorable to the defendants, which raise any substantial doubts that an arrest followed by an imprisonment took place. The evidence discloses that, from the first moment McManus accosted Kilcup in King's office, touching him and telling him he was under arrest, McManus acted without probable or reasonable cause to effect an arrest or to place Kilcup under restraint. Nowhere does the evidence indicate that Kilcup had committed any offense whatever nor had he done or said anything in the presence of any of the witnesses that he had committed or was about to commit a public offense or disorder. *White v. Jansen,* 81 Wash. 435, 142 Pac. 1140. An officer may make an arrest without a warrant for an offense committed in his presence; but an arrest without a warrant for offenses committed without the presence of the officer is unlawful unless he has reasonable grounds to believe (1) that the offense committed is a felony, and (2) that the person apprehended committed the felony. Want of reasonable grounds to believe either renders the arrest unlawful. *Kalkanes v. Willestoft,* 13 Wn. (2d) 127, 124 P. (2d) 219. That an arrest is unlawful is but another way of saying that it is false. Thus, the original declaration of arrest being unlawful here—and, therefore, false—there being no reasonable grounds to believe that a felony had been committed by anyone, much less the plaintiff, and no misdemeanor having taken place in McManus's presence, we proceed to the next element involved, *i.e.,* the imposition of a restraint going beyond a mere verbal declaration.

■ A person is restrained or imprisoned when he is deprived of either liberty of movement or freedom to remain in the place of his lawful choice; and such restraint or imprisonment may be accomplished by physical force alone, or by threat of force, or by conduct reasonably implying that force will be used. One acting under the apparent authority—or color of authority as it is sometimes described— or ostensibly having and claiming to have the authority and powers of a police officer, acts under promise of force in making an arrest and effecting an imprisonment.

If the words and conduct are such as to induce a reasonable apprehension of force and the means of coercion are at hand, a person may be as effectually restrained and deprived of liberty as by prison bars. *Harris v. Stanioch,* 150 Wash. 380, 273 Pac. 198; *James v. MacDougall & Southwick Co.,* 134 Wash. 314, 235 Pac. 812. Undisputed evidence showed a current intention in McManus to use his authority as a deputy sheriff, his assumed powers as a port commissioner having management and control of the airport, and his assumed authority as one of the employers of the airport security force—in short, to employ all of the powers with which he was apparently clothed—to effect an arrest and imprisonment, and to use whatever force seemed essential to carry out this purpose. This threat of force, both actual and implied, together with an exercise of authority, both in the role of special deputy sheriff and as commissioner of the Port of Seattle, continued from the moment of the declaration of arrest at around 2 p.m., and lasted until about 5:30 that afternoon when plaintiff was permitted to leave the airport. Our understanding of a false imprisonment and the legal ramifications thereof is cogently expressed in the treatment on the subject in Restatement, Torts § 35, *et seq.,* with which we are in accord, but we refer particularly to § 41, which says:

"(1) Under the rule stated in § 35, the confinement may be by taking a person into custody under an asserted legal authority.

"(2) The custody is complete if the person against whom and in whose presence the authority is asserted, believes it to be valid or is in doubt as to its validity and submits thereto."

We found no evidence in the record from which either court or jury could infer other than an arrest and imprisonment, and accordingly conclude that the court did not err in directing a verdict for the plaintiff on the matter of liability.

We wish that we could proceed directly to the question of community liability in the usual fashion, but the involvement of a public official raises a unique point which comes

to light in the court's research. A number of cases in our reports, beginning with *Brotton v. Langert,* 1 Wash. 73, 23 Pac. 688 (1890), hold that the community composed of a public official and spouse is not liable for the torts committed by the public official in the performance of his official duties. But *Brotton, supra,* while reputed to be the first case announcing the rule, actually did not do so. There, action was brought against an elected constable for the wrongful levy upon and sale of mortgaged property to the damage of the mortgagee. The constable's wife was never joined as a member of the community and the judgment ran against the constable alone without mention of the community. The true significance of the *Brotton* case was that the community real estate remained exempt from execution on a judgment rendered against the husband only and the fact that he was an elected public official would, in such case, be irrelevant.

The mischief took place when, in *Day v. Henry,* 81 Wash. 61, 142 Pac. 439, our statement attributed the origin of the public official's community immunity doctrine to *Brotton, supra,* by our ruling that the community of an elected sheriff could not be held liable for a wrongful levy made by him. Relieving the sheriff's community followed from the statement in the opinion:

" . . . The individual who filled the office of sheriff was a member of a community, but that membership was as to his individual, and not his official, relation. The office of sheriff could be filled only by the one elected to that office. The duties of the office could be performed only by the one elected to that office . . . The mere fact that the occupant of the office is a married man, and uses the salary of the office to support his family, gives the family no claim on the office. . . ."

With that assertion, the doctrine became locked in, and we now recognize it for the palpable non sequitur it is. Although it is a truism that the wife cannot carry out the duties of the sheriff's office because she has not been elected to it, this is much like saying that the wife cannot assume management and control of the community property because a wife cannot be a husband. Nowhere else have we

said that community liability depends upon the wife's participation in the husband's employment.

*Bice v. Brown,* 98 Wash. 416, 167 Pac. 1097, shows the incongruity of the public official's immunity doctrine and the injustice engendered by it. In this case, the defendants, elected supervisors of a drainage district, directed a project to clear a water course of obstructions. They negligently left great heaps of logs, stumps and debris on the plaintiff's land. The supervisors were married men and received compensation for doing and supervising the work. This court granted immunity to their communities when it said:

" . . . Respondents were not contractors. They were officers of the district, elected to manage its affairs. They committed the tort complained of in connection with the business of the district, not the business of the communities. Since they exceeded their authority the tort was their personal tort. . . . "

We would suggest that the so-called community immunity doctrine, if it ever existed, certainly was inappropriate to the requirements of that case. Surely, when the supervisors of the drainage district knowingly and intentionally left the debris on the land of the plaintiff—a wrong which they then had in their power to correct—relieving their communities of liability in effect granted them a personal immunity from their own wrongs.

And so through succeeding cases such as *Kies v. Wilkinson,* 114 Wash. 89, 194 Pac. 582, 12 A.L.R. 833 (also see 101 Wash. 340, 172 Pac. 351), and *Fidelity & Deposit Co. of Maryland v. Clark,* 144 Wash. 520, 258 Pac. 35, down to *Beakley v. Bremerton,* 5 Wn. (2d) 670, 105 P. (2d) 40, in granting to a public official's community an immunity from liability for torts committed in the course of his official actions, we followed a rule which now seems to have little or no basis in reason or justice and is dictated by neither experience nor necessity.

In *Beakley v. Bremerton, supra,* appellant had been appointed city attorney for Bremerton. In violation of a statute which prohibited any officer of the city from having any interest, directly or indirectly, in any contract for

services furnished the city, he appointed his wife as a stenographer to work in his office. We allowed recovery of the salary so paid against the appellant and his community, noting an exception that, where the community receives the actual benefits of the tort or wrong, the community became liable. Rather than await the gradual erosion of the rule by the engrafting of exceptions upon it case by case, we deem it advisable to and do abrogate the doctrine now and hereby overrule the cases which seem to apply it.

A married person, carrying on his trade, calling or occupation for either a public body or a private employer, serves both his employer, public or private, and his community, and we see no reason for the law to exempt his community if the employer be the public but hold his community liable if his employer be private. In either case, his community shares exactly the same benefits from his office or employment. The community should be and is liable for wrong inflicted by the husband in the execution of his public office or employment occurring through his ignorance, carelessness or mistaken ideas of his official powers and duties. McKay, Community Property (2d ed.) § 823; *Shaw v. Greer*, 67 Ariz. 223, 194 P. (2d) 430.[2]

This brings us to the final problem under discussion —the liability, if any, of the defendants McManuses' community on general grounds, as distinguished from the husband's status as a public official. A community is liable for the tort of either spouse if the tort is calculated to be, is done for, or results in a benefit to the community or is committed in the prosecution of the community business. *LaFramboise v. Schmidt*, 42 Wn. (2d) 198, 254 P. (2d) 485. McManus acted under the color and authority of his public office, as a port commissioner and also as one holding a deputy sheriff's commission. As a port commissioner, he occupied a position of honor and public esteem, bringing

[2] *Shaw v. Greer*, 67 Ariz. 223, 194 P. (2d) 430, adopted this premise and abrogates the public official's community immunity doctrine, but relieved the communities of certain police officers from liability on other grounds.

these benefits to his community, and also received a salary which constituted income to his community. In carrying out the functions of a port commissioner, he was carrying out and engaged in the prosecution of the community business as fully as though he garnered the honors, emoluments and salary of any other occupation, business or calling. That he attempted to carry out his functions and exercised his powers as a commissioner of the Port of Seattle negligently, or in excess of his authority, or maliciously, does not relieve his community of liability as long as he was acting under the color or purported authority of his office.

Neither Mr. Willis nor Mr. Muir, security officers in the employment of the Port of Seattle, were obliged under the law to challenge the commissioner's authority or power in giving them instructions. As a commissioner of the port and one of their employers, known by them to carry on the business and manage the affairs of the airport, and to have a voice in the hiring and firing of personnel, McManus represented the figure of authority, and he clothed himself with the claimed authority and power to assume responsibility for maintaining public peace and quiet in a facility owned, managed and controlled by the official board of which he was a member.

We thus conclude that, in making a false and unlawful arrest and carrying out an unlawful imprisonment of the plaintiff, the port commissioner acted for and on behalf of his community by presuming to act primarily as a port commissioner and secondarily as a deputy sheriff, each function being at the time a community enterprise.

No appeal having been taken from the dismissal of the Port of Seattle, the judgment is affirmed.

ALL CONCUR.