[No. 47439–7.   En Banc.   May 26, 1983.]

STANLEY BENDER, *Respondent*, v. THE CITY
OF SEATTLE, *Petitioner.*

*Stafford, Frey & Mertel,* by *Thomas D. Frey* and *A. Richard Dykstra,* for petitioner.

*Levinson, Friedman, Vhugen, Duggan, Bland & Horowitz,* by *Donald J. Horowitz* and *C. Steven Fury,* for

respondent.

WILLIAMS, C.J.—Respondent Stanley Bender, a Seattle jeweler, instituted this action for damages alleging he had been subjected to false arrest, false imprisonment, malicious prosecution, libel and slander by employees of the petitioner City of Seattle (City). This action arose after criminal charges against the respondent for two counts of grand larceny by possession were dismissed because the key prosecution witness refused to testify. The cause was submitted to the jury on all theories and it returned an unsegregated verdict of $80,000 against the City.

In an unpublished opinion, the Court of Appeals held that a verdict should have been directed in favor of the City on the false arrest or false imprisonment claim because respondent's arrest was pursuant to a facially valid warrant. The court ruled that the other causes of action were properly submitted to the jury. Since the false arrest or false imprisonment issue was considered by the jury and the effect on the unsegregated verdict could not be ascertained, the court remanded for retrial on the limited issue of damages for the remaining causes of action: malicious prosecution, libel, and slander. Both parties petitioned for review, and we granted both petitions. *Bender v. Seattle,* 95 Wn.2d 1001 (1981).

We reverse the Court of Appeals in part, affirm in part, and fully reinstate the jury's unsegregated verdict.

On July 18, 1975, the residence of Phyllis Brooks was burglarized and several items of jewelry were taken, including two lady's diamond rings. Daniel Gill Johnson was a suspect in the burglary, but remained at large until October of 1975 when he was arrested on a burglary charge unrelated to the Brooks incident. While in custody, Johnson told Detective Rudy Vanderlaan of the Seattle Police Department that he wanted to exchange information on numerous burglaries for a recommendation of a reduced sentence. The detective conveyed the proposal to the chief criminal deputy, who agreed that the prosecutor's office

would not charge Johnson with new crimes and would reduce its recommendation on existing charges. Johnson then gave Detective Vanderlaan information about numerous burglaries and thefts in the Seattle area including his burglary of the Brooks residence. He also told the detective that two of the rings taken from the Brooks residence were sold to Stanley Bender on July 18, 1975, and that he had sold stolen property to Bender on prior occasions. Johnson further stated that he returned the next day and sold Bender additional items of jewelry that Bender knew to be stolen.

Detective James W. Moore and Detective Vanderlaan testified that on October 9, 1975, they went to Bender's jewelry store and located the stolen rings. The store's records indicated one purchase from Daniel Johnson on July 18, 1975, but the purchase price appeared to have been changed from $125 to $275. One of the detectives asked Bender who had made the entry in the book, but Bender said he did not know. Bender produced two cash receipts dated July 19, 1975, and explained that the cash register already had closed at the time of the purchase on July 18. He claimed that he did not recognize an employee's initials on the receipt. Bender explained to the detectives that he had been golfing in Olympia on July 18, 1975, and testified that he offered to produce witnesses and other proof to corroborate his story. Detective Vanderlaan testified that he declined the offer because he simply did not believe Bender. Bender stated that one of his employees made the July 18 purchase from Johnson, but that he had purchased a dinner ring from Johnson on July 19. He denied knowledge that the ring was stolen. Bender further offered to take a lie detector test as to the truthfulness of his statements.

On October 16, 1975, a polygraph test was administered to Johnson by Detective Donald Vert, a member of the Seattle Police Department Polygraph Unit, regarding the sale of jewelry to Bender. Detective Vert's report noted nondeceptive responses to three questions, but did note

some deception as to one relevant question. Detective Vert noted in his report that Johnson appeared sure of one sale to Mr. Bender, but not to two sales. Johnson also stated he had "shot up with heroin" about 1 hour prior to the sale to Bender and felt "spaced out" at the time of the sale. Despite Detective Vert's suggestion that Bender be given the opportunity to submit to a polygraph examination, no such test was administered.

Detective Vanderlaan took the above information to the King County Prosecuting Attorney's Office and consulted with a deputy prosecutor. A preliminary determination of probable cause to arrest and prosecute was made by the prosecutor without further investigation. On October 23, 1975, Detective Vanderlaan prepared and filed an affidavit requesting a search warrant for Bender's jewelry store. Also on the same day, an information was filed charging Bender with grand larceny by possession. A search warrant and an arrest warrant were issued that same day.

Pursuant to the warrants, Detective Vanderlaan went to Bender's store, placed him under arrest, and executed the search warrant. Bender was booked into the King County Jail and remained in custody for a short time until released on bail. News of the arrest was made available to the news media, and stories appeared in three newspapers as well as on television and radio. In addition, Detective Vanderlaan held an informal press conference and gave information which Bender claimed was not entirely accurate. Shortly thereafter, Johnson refused to testify at Bender's criminal prosecution and the case was dismissed with prejudice.

Bender brought suit against the City based on allegations of false arrest and false imprisonment, malicious prosecution, and libel and slander. Bender's primary contention was that a full disclosure of all known information and a proper investigation by the police would have persuaded the prosecution not to file criminal charges because of a lack of probable cause. All theories of liability were submitted to the jury which returned a special verdict finding liability on each theory, but awarding damages in one total

sum without specific apportionment.

The City assigns error to the trial court's failure to direct a verdict in its favor on each of the three theories of liability and to certain of the court's jury instructions. Conversely, Bender contends the instructions were not properly excepted to and that sufficient evidence exists to support the jury's verdict on each theory of liability.

A motion for a directed verdict may be granted only if it can be said, as a matter of law, that no evidence or reasonable inferences existed to sustain a verdict for the party opposing the motion. The evidence must be considered in the light most favorable to the nonmoving party. *Bertsch v. Brewer*, 97 Wn.2d 83, 90, 640 P.2d 711 (1982); *Reiboldt v. Bedient*, 17 Wn. App. 339, 344, 562 P.2d 991 (1977).

# I

## IMMUNITY

First, the City contends it is immune from tort liability in this case because the actions of its officers were high level discretionary acts.

By its enactment of Laws of 1961, ch. 136, § 1, p. 1680 (RCW 4.92.090),[1] and Laws of 1967, ch. 164, § 1, p. 792 (RCW 4.96.010),[2] the Legislature effectively abolished the principle of sovereign immunity in Washington. Thereafter, we created the very narrow exception of discretionary governmental immunity in the case of *Evangelical United Brethren Church v. State*, 67 Wn.2d 246, 407 P.2d 440

---

[1]RCW 4.92.090 provides:

"The state of Washington, whether acting in its governmental or proprietary capacity, shall be liable for damages arising out of its tortious conduct to the same extent as if it were a private person or corporation."

[2]RCW 4.96.010 provides in pertinent part:

"All political subdivisions, municipal corporations, and quasi municipal corporations of the state, whether acting in a governmental or proprietary capacity, shall be liable for damages arising out of their tortious conduct, or the tortious conduct of their officers, agents or employees to the same extent as if they were a private person or corporation: . . ."

(1965). The purpose of our limited, court–created rule of immunity is to prevent the courts from passing judgment on basic policy decisions that have been committed to coordinate branches of government. Since the concept of discretionary governmental immunity is a court–created exception to the general rule of governmental tort liability, its applicability is necessarily limited only to those high level discretionary acts exercised at a truly executive level. In order to facilitate the distinction between the type of discretion exercised at a truly executive level, to which immunity is granted, from that discretion exercised at an operational level, to which liability may attach, we set out the following preliminary questions in *Evangelical*, at page 255:

> (1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

In *King v. Seattle*, 84 Wn.2d 239, 246, 525 P.2d 228 (1974), we set out an additional requirement for the availability of discretionary immunity:

> Immunity for "discretionary" activities serves no purpose except to assure that courts refuse to pass judgment on policy decisions in the province of coordinate branches of government. *Accordingly, to be entitled to immunity the state must make a showing that such a policy decision, consciously balancing risks and advantages, took place. The fact that an employee normally engages in "discretionary activity" is irrelevant if, in a given case, the employee did not render a considered decision.*

(Italics ours.)

In *Mason v. Bitton,* 85 Wn.2d 321, 327–29, 534 P.2d 1360 (1975), we further clarified the scope of discretionary governmental immunity by stating the exception applied only to "*basic policy discretion.*" That case involved a high speed chase by police officers and whether liability would or would not attach for damages caused in the chase. We held such activity to be outside the realm of discretionary functions for which governmental entities are immune:

> We are fully convinced that the initial decision to give or not to give chase, and the decision as to whether to continue the pursuit are properly characterized as *operational,* and not the "basic policy decision" discussed in *King,* at page 246. To now hold that this type of discretion, exercised by police officers in the field, cannot result in liability under RCW 46.61.035, due to an exception provided for basic policy discretion, would require this court to close its eyes to the clear intent and purpose of the legislature when it abolished sovereign immunity under RCW 4.96.010. If this type of conduct were immune from liability, the exception would surely engulf the rule, if not totally destroy it.

*Mason,* at 328–29.

In *Clipse v. Gillis,* 20 Wn. App. 691, 582 P.2d 555 (1978), the Court of Appeals granted immunity to police officers in the investigation of criminal complaints because such activity was of a discretionary nature. The court stated that the officers were immune for their negligent conduct, but could be liable upon proof of corrupt or malicious motives. *Clipse,* at 696. In *Moloney v. Tribune Pub'g Co.,* 26 Wn. App. 357, 613 P.2d 1179 (1980), the Court of Appeals relied on the *Clipse* decision to grant immunity to police officers engaging in the discretionary act of releasing investigation information to the press. In neither *Clipse* nor *Moloney* did the courts determine whether the actions of those police officers were "basic policy decisions" or whether actual balancing of risks and advantages took place. Although police investigations and the disclosure of investigation information to the press are of a discretionary nature, we do not view those actions as the type of high

level, policymaking decisions of a governmental entity that fall within the rule of discretionary governmental immunity. Instead, such conduct is more closely analogous to the type of discretion exercised at an everyday operational level, such as whether or not to engage in a high speed chase. *See Mason v. Bitton, supra; King v. Seattle, supra.* Thus, to the extent the Court of Appeals decisions in *Clipse* and *Moloney* purport to extend the limited doctrine of discretionary governmental immunity, we now expressly disapprove of those cases.

Accountability through tort liability in areas outside the narrow exception noted above may be the only way of assuring a certain standard of performance from governmental entities. As we stated in *King v. Seattle, supra* at 244:

> These fears [upon a rationale for personal liability of government officials for discretionary acts] are not founded upon fact, however, if it is the municipality and not the employee who faces liability. The most promising way to correct the abuses, if a community has the political will to correct them, is to provide incentives to the highest officials by imposing liability on the governmental unit. The ranking officials, motivated by threats to their budget, would issue the order that would be necessary to check the abuses in order to avoid having to pay damages.

## II
### FALSE ARREST AND FALSE IMPRISONMENT

■ False arrest and false imprisonment can be distinguished by the manner in which each cause of action arises. *See* E. Fisher, *Arrest* § 183 (1967 & Supp. 1973). False arrest may be committed only by one who has legal authority to arrest or who had pretended legal authority to arrest. *Kilcup v. McManus,* 64 Wn.2d 771, 394 P.2d 375 (1964). On the other hand, false imprisonment may exist entirely apart from any purported process of law enforcement, as by private individuals acting on their own initiative for their own private purposes without any pretense of legal authority. *Hepworth v. Covey Bros. Amusement Co.,* 97 Utah 205,

91 P.2d 507 (1939). While the courts below treated false arrest and false imprisonment as a single theory of recovery, we view the facts as properly setting forth a cause of action for false arrest.

The gist of an action for false arrest or false imprisonment is the unlawful violation of a person's right of personal liberty or the restraint of that person without legal authority:

> A person is restrained or imprisoned when he is deprived of either liberty of movement or freedom to remain in the place of his lawful choice; and such restraint or imprisonment may be accomplished by physical force alone, or by threat of force, or by conduct reasonably implying that force will be used. One acting under the apparent authority—or color of authority as it is sometimes described—or ostensibly having and claiming to have the authority and powers of a police officer, acts under promise of force in making an arrest and effecting an imprisonment.

*Kilcup,* at 777. The gist of an action for malicious prosecution, on the other hand, does not necessarily involve an interference with personal liberty, but rests on malice and want of probable cause. *Peasley v. Puget Sound Tug & Barge Co.,* 13 Wn.2d 485, 498–99, 125 P.2d 681 (1942); *Pallett v. Thompkins,* 10 Wn.2d 697, 699, 118 P.2d 190 (1941). An otherwise lawful arrest does not become unlawful even if prompted by malicious motives, and the existence or nonexistence of malice is immaterial to the question of liability for false arrest or false imprisonment.

In an action for false arrest the general rule is that an officer is not liable if he makes an arrest under a warrant or process which is valid on its face, even though there are facts within his knowledge which would render it void as a matter of law. *Pallett v. Thompkins, supra; Cavitt v. McCrite,* 194 Wash. 684, 688, 79 P.2d 637 (1938). This rule serves to protect officers who execute warrants, because those officers generally are not in a position to fully know the underlying facts giving rise to the issuance of the warrant. Certainly, we should not require officers to question

the authority of courts issuing such facially valid warrants. Thus, when one officer seeks a warrant and another officer executes it, as in *Pallett* and *Cavitt,* the arresting officer is insulated from liability for false arrest.

A different situation is presented, however, when the same officer provides information to obtain the warrant and then also executes the warrant. When one officer serves both functions, he is not merely directed to fulfill the order of the court; he is in a position to control the flow of information to the magistrate upon which probable cause determinations are made. We see no distinction between an officer who makes an invalid, warrantless arrest and one who knowingly withholds facts in order to obtain a warrant. No policy is served by extending the nonliability rule of *Pallett* and *Cavitt* in false arrest cases when an officer simply interposes a magistrate between himself and the arrested individual. When the same officer seeks the warrant and executes it, he should not be allowed to "cleanse" the transaction by supplying only those facts favorable to the issuance of a warrant.[3] The exception we now announce to the general nonliability rule of *Pallett* and *Cavitt* only prevents an officer from asserting the facial validity of a warrant as an absolute defense to a false arrest or false imprisonment action. The officer can still establish a defense to such an action by proving, to the satisfaction of the jury, the existence of probable cause to arrest under the circumstances.

In the case before us, we find there was sufficient evi-

---

[3]According to Dean Prosser, one may be liable for false arrest or false imprisonment even if he or she is not the person who physically restrains the plaintiff:

> One who participates in an unlawful arrest, or procures or instigates the making of one without proper authority, will be liable for the consequences; but the defendant must have taken some active part in bringing about the unlawful arrest itself, by some "affirmative direction, persuasion, request or voluntary participation."

(Footnotes omitted.) W. Prosser, *Torts* § 11, at 47 (4th ed. 1971). Thus, since an officer can be liable for false arrest for merely procuring the arrest of another falsely, there is even less reason for extending the defense of the facial validity of a warrant to an officer who obtains and executes a warrant.

dence to go to the jury on the false arrest and false imprisonment cause of action. The jury found in favor of the respondent on this issue, and we will not disturb the jury's determination.

## III
### MALICIOUS PROSECUTION

Next, the City contends that once a prosecuting attorney has made a determination of probable cause to arrest, it is improper to submit the issue of malicious prosecution to the jury.

To maintain an action for malicious prosecution, the plaintiff must allege and prove the following:

> (1) that the prosecution claimed to have been malicious was instituted or continued by the defendant; (2) that there was want of probable cause for the institution or continuation of the prosecution; (3) that the proceedings were instituted or continued through malice; (4) that the proceedings terminated on the merits in favor of the plaintiff, or were abandoned; and (5) that the plaintiff suffered injury or damage as a result of the prosecution.

*Gem Trading Co. v. Cudahy Corp.*, 92 Wn.2d 956, 962–63, 603 P.2d 828 (1979) (quoting from *Peasley v. Puget Sound Tug & Barge Co.*, 13 Wn.2d 485, 497, 125 P.2d 681 (1942)).

■ Malice and want of probable cause are the gist of the action, and the burden of proof rests on the plaintiff. *Peasley*, at 498–99. The method of determining probable cause or the lack thereof is set out in *Peasley*, at pages 499–500, as follows:

> If it clearly appears that the defendant, before instituting criminal proceedings against the plaintiff, made to the prosecuting attorney a full and fair disclosure, in good faith, of all the material facts known to him, and that the prosecuting attorney thereupon preferred a criminal charge and caused the arrest of the accused, probable cause is thereby established as a matter of law and operates as a complete defense to a subsequent action by the accused. And the same rule prevails where such disclosure was made to a competent practicing attorney, and the criminal prosecution was instituted

upon his advice. . . .

*A corollary to this rule is that if any issue of fact exists, under all the evidence, as to whether or not the prosecuting witness did fully and truthfully communicate to the prosecuting attorney, or to his own legal counsel, all the facts and circumstances within his knowledge, then such issue of fact must be submitted to the jury with proper instructions from the court as to what will constitute probable cause, and the existence or nonexistence of probable cause must then be determined by the jury.*

(Citations omitted. Italics ours.) As to malice, while it may be inferred from the lack of probable cause, it is not a necessary deduction from this circumstance. As a term of law,

[m]alice . . . has a broader significance than that which is applied to it in ordinary parlance. The word "malice" may simply denote ill will, spite, personal hatred, or vindictive motives according to the popular conception, but in its legal significance it includes something more. It takes on a more general meaning, so that the *requirement that malice be shown as part of the plaintiff's case in an action for malicious prosecution may be satisfied by proving that the prosecution complained of was undertaken from improper or wrongful motives or in reckless disregard of the rights of the plaintiff.* Impropriety of motive may be established in cases of this sort by proof that the defendant instituted the criminal proceedings against the plaintiff: (1) without believing him to be guilty, or (2) primarily because of hostility or ill will toward him, or (3) for the purpose of obtaining a private advantage as against him. Newell, Malicious Prosecution (1892), 237, § 3; 34 Am. Jur. 728, Malicious Prosecution, § 45; 38 C. J. 421–425, Malicious Prosecution, §§ 60–67; 3 Restatement, Torts (1938), § 668. We have recognized and applied this broader conception of the term in *Waring v. Hudspeth,* [75 Wash. 534, 135 P. 222 (1913)]. Compare *Ladd v. Miles,* [171 Wash. 44, 17 P.2d 875 (1932)].

(Italics ours.) *Peasley,* at 502.

This language in *Peasley* makes it unmistakably clear that if a factual issue as to probable cause or malice exists, the question must be submitted to the jury. The credibility

of witnesses and the weight to be given the evidence are matters that rest within the province of the jury; and, even if the court were convinced that a wrong verdict had been entered, it should not substitute its judgment for that of the jury so long as there was evidence which, if believed, would support the verdict rendered. *Burke v. Pepsi–Cola Bottling Co.,* 64 Wn.2d 244, 246, 391 P.2d 194 (1964). *Accord, Retail Clerks Health & Welfare Trust Funds v. Shopland Supermarket, Inc.,* 96 Wn.2d 939, 943, 640 P.2d 1051 (1982); *State v. O'Connell,* 83 Wn.2d 797, 839, 523 P.2d 872, 77 A.L.R.3d 874 (1974).

As the Court of Appeals in its unpublished opinion at page 10 put it, "[t]he evidence is in sharp conflict [as to] whether the officers, in good faith, made a full and fair disclosure of all material facts known to them." Given the fact that Bender admitted purchasing the rings in question and thereafter produced the rings and all records pertaining to the purchase, the only remaining question was whether Bender *knew* the rings were stolen. Bender denied having any such knowledge. The critical issue to establish probable cause then became Daniel Gill Johnson's credibility. The importance of Johnson's credibility is evidenced by the testimony of Deputy Prosecutor Richard Blacklow in response to questions directed by Bender's attorney, Mr. Donald Horowitz:

> Q: Now, I take it that in this case the case hinged on the credibility of Johnson, did it not? A: Large part of it. Q: So any information which pertained to his credibility was important to you? A: Yes.

Verbatim Report of Proceedings, at 1461–62. Mr. Blacklow and another deputy prosecuting attorney, Richard F. McDermott, each testified that they were informed Johnson went to Mr. Bender's shop because Bender had purchased stolen goods from him before. The impression given was that the passage of stolen items through Bender's store was a frequent occurrence. Detective Vanderlaan testified that he investigated Johnson's allegations of prior transactions at Bender's store, but he found no evidence of such prior

transactions. Vanderlaan testified that he did not include the results of his investigation, which failed to substantiate Johnson's statements, in any documents revealed to the prosecutor's office. Further, Mr. Blacklow stated he was not aware of any investigation of Johnson's allegations that Bender had previously purchased stolen goods from Johnson, nor was he aware of the results of that investigation. Since Johnson's credibility was critical to the case, Detective Vanderlaan's failure to disclose information bearing on Johnson's credibility created a question for the jury.

There were at least two other instances of nondisclosure on the part of Detective Vanderlaan. First, he failed to inform the prosecutor's office of Bender's immediate compliance with the reporting laws which require jewelers to report purchases to the police. He also failed to provide copies of documents in support of Bender's compliance with regard to the purchase of goods from Johnson. Such compliance with reporting requirements was consistent with Bender's claims of propriety of the transaction and served to reinforce Bender's credibility—also an issue in this case since the case turned on the word of Johnson versus Bender. Second, Vanderlaan did not advise the deputy prosecuting attorney that the alleged disproportionate price paid by Bender, compared to the actual value of the rings, was not at all unusual in the second–hand jewelry market in Seattle with respect to legitimate transactions. That the price paid by Bender to Johnson was not out of the ordinary was known to Vanderlaan at the time he investigated this case.

Testimony was presented to the jury in which the chief deputy prosecutor stated that, while with the information initially given to the prosecuting attorney by the police he would have filed the charges against Bender, if he had had the additional information, he "would not have filed the case". Whether the additional information, such as Vanderlaan's inability to substantiate Johnson's statements of prior sales to Bender, was "material" to the determination of probable cause is a question for the jury. Although fac-

tually there is a strong case for probable cause here, it is not for this court to second–guess the jury's determination as long as the jury was properly instructed and sufficient evidence existed to substantiate the verdict. The trial judge and the Court of Appeals each found sufficient evidence to raise a jury question. We likewise find sufficient evidence to justify the jury's verdict.

█ Unfortunately, there is language in the *Peasley* case that seems to imply that probable cause is somehow a subjective determination to be made by a prosecutor. Probable cause, however, must be measured by an *objective* standard:

> Probable cause exists where the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a *man of reasonable caution* in a belief that an offense has been or is being committed.

(Citations omitted. Italics ours.) *State v. Gluck,* 83 Wn.2d 424, 426–27, 518 P.2d 703 (1974). This objective standard is one that can be applied by a properly instructed jury as well as a judge. There is no guaranty of a uniform result in any given case, but the important thing is that a "reasonable person" standard must be applied. The City suggests that since several deputy prosecutors found the existence of probable cause, this somehow settles the question. We disagree. The subjective views of those deputy prosecutors on the question of probable cause merely constitute evidence which could be considered by the jury along with any other evidence on the existence or nonexistence of probable cause.

The City also assigns error to the giving of instruction 12 on the grounds that it injects a negligence standard into the malicious prosecution action.[4] Neither at the trial court

---

[4] Instruction 12 states:

"A city is not liable for false arrest, false imprisonment, or malicious prosecution when a police officer has probable cause for making an arrest. An arrest warrant which is valid on its face ordinarily constitutes probable cause. This rule is subject to the following qualifications:

level in its exceptions to instruction 12 nor in its assignments of error to the Court of Appeals was objection raised to this portion of the instruction. Instead, the City stated an entirely different theory in its exception and assignment of error:

> Defendants would next except to the Court's proposed instruction no. 12 on the basis that, first of all, an officer does not need probable cause to go to a prosecuting attorney. He can go at any time he wants and deliver material to determine whether or not there is sufficient evidence to file a charge or whether or not a prosecutor will file a charge. Probable cause, really, has no bearing in this case with regard to the arrest, once it is shown that the officers have gone to a prosecuting attorney and an independent determination has been made. Also, in this case, probable cause was found as a matter of law by virtue of the order of Judge Thompson, as shown in the evidence, and the court issued a warrant for the arrest. That arrest warrant and that search warrant have never been challenged on their validity, and, accordingly, this instruction should not be given.

Verbatim Report of Proceedings, at 4.

The assignment of error to the Court of Appeals concerned itself with an objection to the instruction because it failed to include the City's immunity theory of its case. It is only in its petition for review to this court that the City

---

"When presenting a case to a prosecuting attorney to cause the filing of a criminal charge and to obtain authority for an arrest warrant, police officers are required to make a full and fair disclosure, in good faith, of all known material facts.

"When an officer makes such a full and fair disclosure to a prosecuting attorney and the prosecuting attorney, based upon such disclosure, institutes a criminal charge and obtains an arrest warrant then the actions of the prosecuting attorney constitute probable cause for the arrest and is a complete defense to claims for false arrest, false imprisonment, and malicious prosecution. However, if an officer does not make such a full and fair disclosure, then the actions of a prosecuting attorney in filing a criminal charge and causing an arrest warrant to be issued do not necessarily constitute probable cause representing a defense to such claims. In such event, you must determine whether or not the officer had probable cause for the arrest from the totality of the material facts which *should have been known* and disclosed by the officer to a prosecuting attorney." (Italics ours.) Clerk's Papers, at 31.

claims the offending language noted above was in error. This is too late. Our rules require that

> [t]he objector shall state distinctly the matter to which he objects and the grounds of his objection, specifying the number, paragraph or particular part of the instruction to be given or refused and to which objection is made.

CR 51(f). Appellate courts will only review claimed error which is included in an assignment of error or clearly disclosed in the associated issue pertaining thereto. RAP 10.3(g). *See also* RAP 10.3(a)(3); RAP 12.1(a); *Pettet v. Wonders,* 23 Wn. App. 795, 599 P.2d 1297 (1979).

## IV
### LIBEL AND SLANDER

Finally, the City assigns error to the trial court's failure to direct a verdict in its favor on the issues of libel and slander. It is the City's contention that these causes of action fail because of insufficient evidence.

Under our case law, a defamation plaintiff must establish four essential elements to recover: (1) falsity; (2) an unprivileged communication; (3) fault; and (4) damages. *Mark v. Seattle Times,* 96 Wn.2d 473, 486, 635 P.2d 1081 (1981); *Sims v. KIRO, Inc.,* 20 Wn. App. 229, 233, 580 P.2d 642 (1978); Restatement (Second) of Torts § 558 (1977). The degree of fault necessary to make out a prima facie case of defamation depends on whether the plaintiff is a private individual or a public figure or public official. If the plaintiff is a private individual, a negligence standard of fault applies. *Taskett v. KING Broadcasting Co.,* 86 Wn.2d 439, 445, 546 P.2d 81 (1976). Otherwise, the plaintiff must prove "actual malice"—that is, knowledge of falsity or reckless disregard of the truth or falsity—to recover. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 342, 41 L. Ed. 2d 789, 94 S. Ct. 2997 (1974); *Curtis Pub'g Co. v. Butts,* 388 U.S. 130, 18 L. Ed. 2d 1094, 87 S. Ct. 1975 (1967); *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 11 L. Ed. 2d 686, 84 S. Ct. 710, 95 A.L.R.2d 1412 (1964). The cases

decided since *New York Times Co., Curtis Pub'g Co.*, and *Gertz* make it clear that a person is not considered a "public figure" solely because that person is a criminal defendant, *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 61 L. Ed. 2d 450, 99 S. Ct. 2701 (1979), has sought relief through the courts, *Time, Inc. v. Firestone*, 424 U.S. 448, 47 L. Ed. 2d 154, 96 S. Ct. 958 (1976), or is involved in a controversy which is newsworthy. Instead, the court usually has required that the plaintiff undertake some voluntary act by which he seeks to influence the resolution of public issues. *See Time, Inc. v. Firestone, supra* at 454. We do not view Bender as a public figure simply because he is a prominent business owner accused of a crime. Nevertheless, Bender may be required to meet the higher standard set out in *Gertz* if the statements of Detective Vanderlaan are entitled to some sort of privilege.

An absolute privilege or immunity is said to absolve the defendant of all liability for defamatory statements. *McNeal v. Allen*, 95 Wn.2d 265, 267, 621 P.2d 1285 (1980); *Gold Seal Chinchillas, Inc. v. State*, 69 Wn.2d 828, 830, 420 P.2d 698 (1966). A qualified privilege, on the other hand, may be lost if it can be shown that the privilege has been abused. *Gem Trading Co. v. Cudahy Corp.*, 92 Wn.2d 956, 960, 603 P.2d 828 (1979). Absolute privilege is usually confined to cases in which the public service and administration of justice require complete immunity. Legislatures in debate, judges and attorneys in preparation or trial of cases, statements of witnesses or parties in judicial proceedings, and statements of executive or military personnel acting within the duties of their offices are frequently cited examples. *See Twelker v. Shannon & Wilson, Inc.*, 88 Wn.2d 473, 475–78, 564 P.2d 1131 (1977). Generally, some compelling public policy justification must be demonstrated to justify the extraordinary breadth of an absolute privilege.

Some courts have afforded police officers an absolute privilege as to statements or communications made in the performance of official duties. *See, e.g., Hauser v. Urchisin,*

231 So. 2d 6, 8 (Fla. 1970); *Catron v. Jasper,* 303 Ky. 598, 198 S.W.2d 322 (1946). Most courts, however, hold that only a qualified privilege attaches. *See, e.g., Carr v. Watkins,* 227 Md. 578, 177 A.2d 841 (1961); *Krebs v. McNeal,* 222 Miss. 560, 76 So. 2d 693 (1955); *Mullens v. Davidson,* 133 W. Va. 557, 57 S.E.2d 1, 13 A.L.R.2d 887 (1949). Statements of police officers in releasing information to the public and press serve the important functions of informing and educating the public about law enforcement practices. The right to inform the public, however, does not include a license to make gratuitous statements concerning the facts of a case or disparaging the character of other parties to an action. *Gold Seal Chinchillas, Inc. v. State, supra* at 835 (Rosellini, C.J., concurring in the result).

Although the release of information to the press and public by police officers is a very important function, we are persuaded that such communications do not rise to the level of such compelling public policy as to require an absolute privilege. We believe a qualified privilege will adequately protect police officers in releasing information to the public and press. It is then the plaintiff's burden to establish an abuse of that qualified privilege to recover. Since we view this function as important enough to afford police officers a qualified privilege, the standard of proving abuse of the privilege must necessarily be high.

■ As we noted in *Mark v. Seattle Times, supra* at 492 n.5, proof of an abuse of a qualified privilege must be established by clear and convincing evidence, not simply by a preponderance of the evidence. The Restatement (Second) of Torts § 600, at 288 (1977), discusses abuse of qualified privileges and suggests that knowledge or reckless disregard as to the falsity of a statement is necessary to prove abuse of a qualified privilege. Other courts have adopted this rule that proof of knowledge or reckless disregard as to the falsity of a statement is necessary to establish abuse of a qualified privilege. *See Glynn v. Kissimmee,* 383 So. 2d 774 (Fla. Dist. Ct. App. 1980); *Sewell v. Brookbank,* 119 Ariz. 422, 581 P.2d 267 (Ct. App. 1978); *Toker v.*

*Pollak,* 44 N.Y.2d 211, 376 N.E.2d 163, 405 N.Y.S.2d 1 (1978); *Bozicevich v. American Airlines, Inc.,* 54 A.D.2d 542, 387 N.Y.S.2d 120 (1976); *Hahn v. Kotten,* 43 Ohio St. 2d 237, 331 N.E.2d 713 (1975); *Mullens v. Davidson, supra.* We now adopt that standard as our own.

In the case now before us, the trial judge anticipated our present holding and instructed the jury that Detective Vanderlaan's statements were entitled to a qualified privilege. The jury was further instructed as to the abuse of a qualified privilege, and no exceptions were taken to the instructions. We find there was sufficient evidence for the libel and slander issues to have gone to the jury. Since the jury decided in favor of Bender after being properly instructed as to the law of defamation, we uphold that determination.

For all the reasons stated above, we reverse the Court of Appeals as to the false arrest issue, but affirm the court as to the other issues of malicious prosecution and libel and slander. We remand the case with instructions to fully reinstate the jury's unsegregated verdict.

Reversed and remanded with instructions.

ROSELLINI, UTTER, BRACHTENBACH, DOLLIVER, and PEARSON, JJ., concur.

DIMMICK, J. (concurring in part, dissenting in part)— Bender's claims for malicious prosecution and false arrest should never have been decided by the jury. Probable cause for Bender's arrest existed as a matter of law and thus defeated both causes of action.

It should be borne in mind that

> [our] court, in common with most other courts, has frequently said that actions for damages for malicious prosecution are not favored in law, . . . The reasons assigned for this attitude on the part of the courts are that it is to the best interest of society that those who offend against the law shall be promptly punished; that any citizen who has good reason to believe that the law has been violated shall have the right to take proper steps to cause the

arrest of the offender; and that in taking such steps the citizen who acts in good faith shall not be subjected to damages merely because the accused is not convicted; yet, withal, that no man shall be charged with a crime, exposed to the danger of a conviction, and subjected to the expense, vexation, and ignominy of a public trial merely for the gratification of another's malice or ill will.

*Peasley v. Puget Sound Tug & Barge Co.,* 13 Wn.2d 485, 496–97, 125 P.2d 681 (1942).

As indicated by the majority, it is well established that the causes of action for malicious prosecution and false arrest require that plaintiff prove want of probable cause and malice. If a full and fair disclosure of all material facts is made to the prosecuting attorney and the prosecutor thereupon causes the arrest of the accused, probable cause is established as a matter of law and operates as a complete defense. *Peasley v. Puget Sound Tug & Barge Co., supra; Pace v. Brodie–National, Inc.,* 60 Wn.2d 654, 374 P.2d 1000 (1962); *Robertson v. Bell,* 57 Wn.2d 505, 358 P.2d 149 (1961); *Olsen v. Fullner,* 29 Wn. App. 676, 630 P.2d 492 (1981). After examining the entire record, I conclude that this rule of law is clearly applicable in the instant case.

Daniel Johnson confessed to the commission of numerous burglaries to Seattle Police Detective Vanderlaan, and supplied information on his sales transactions to the detective. Johnson gave a written statement to Vanderlaan saying he had sold stolen rings to Bender on July 18 and 19, 1975, and had told Bender they were stolen. The police located the rings in Bender's jewelry store in the University District. The store's records indicated that the dates of sales and receipts did not match and the amounts paid appeared to have been changed. The rings were purchased for a fraction of their value—a fact proven by an insurance policy and appraisal report on the stolen jewelry. Johnson told the police that he had sold stolen jewelry to Bender in the past. Johnson took a polygraph test with regard to this information.

Bender, upon questioning, was unwilling to identify the

initials of the employee on the receipt for the jewelry and did so only during the course of this trial. He provided police with the following statement:

> On 7–18–75 I was playing golf in Olympia & did not work at my shop on U–Way. My help purchased a diamond wedding set from a Dan Johnson for $125. This was after 5 p.m. so we would have included it on our 7–19 business day. On 7–19–75 . . . Dan Johnson came in to the store on U–Way & I bought a dinner ring (2 lg & 14 small diamonds) for $150 cash. He did not tell me that it was stolen. The above is a true & voluntary statement made without threats, promises, or duress. On the 18th day of July, I was never in the store at all. [/s/ Bender]
>
> I would take a polygraph exam regarding the above facts. [/s/ Bender]

Vanderlaan presented all this information, including the polygrapher's entire report of the result of Johnson's test, to the prosecutors. In addition, one of the prosecutors recalled discussing with Vanderlaan Johnson's past criminal record and drug problems.

The prosecutor, in addition to having the facts supplied by Vanderlaan before him, checked office files which disclosed that stolen property had been discovered in another of Bender's stores in the past. One of Bender's employees had pleaded guilty to possession of the stolen property. Also in the files was evidence that Bender personally had purchased some 27 stolen rings and mountings a few days after the transactions with Johnson. In fact, the senior deputy testified he considered adding an additional count covering those rings. Thus, the prosecuting attorney's office made its finding of probable cause, in part, from its own office information not even known to Vanderlaan. The prosecutor's office filed an information for grand larceny by possession and obtained a superior court warrant for the arrest of Bender. Pursuant to the warrant, the police took plaintiff into custody. This case was dismissed when Johnson refused to testify.

Testimony at the instant trial by three deputy prosecutors involved in the larceny case was that they believed

nothing material was withheld from them and they believed, even at the time of this trial, that there was probable cause to arrest and charge Bender. Testimony by Chief Deputy Dave Boerner, called as a witness by Bender and relied upon by the majority, was that he thought there would be probable cause for Bender's arrest even considering the facts later supplied by Bender's attorney, including Bender's explanation that when he wrote "I" in his statement he meant his employees and not himself. The most that can be said for plaintiff's case is that Mr. Boerner appeared to indicate that probable cause was an individual determination and he hypothesized that he himself may not have chosen to charge under the later known facts, some of which only came out in court, as he requires almost a proof–beyond–a–reasonable–doubt standard. Mr. Boerner was not one of the prosecutors who made the original determination to seek a warrant; so, at best, his testimony was speculative. He did not testify that any material evidence was withheld by the police.

In spite of the seemingly overwhelming evidence of probable cause, the majority opinion, at page 596, lists three facts which it alleges Officer Vanderlaan did not convey to the prosecutors, and which it believes to be material. The majority first asserts that since Johnson's credibility was important, Vanderlaan should have informed the prosecutor that he had investigated the allegations made by Johnson regarding prior dealings with Bender but found no evidence as to such dealings. While I feel Johnson's credibility was fairly well established by the polygraph, I will discuss the so–called "investigation" of prior dealings engaged in by Vanderlaan.

Vanderlaan did not testify that Johnson had told him he had sold property to Bender before and informed Bender that it was stolen. Johnson indicated to Vanderlaan, however, that he knew Bender and had sold him property before. He also indicated that he had sold to many other merchants in the area. Vanderlaan testified he was unable to check on the story of prior sales since Johnson was

uncertain of details of where he had stolen property and its description and to whom it had been sold. Vanderlaan merely indicated at trial that he did not have a lineup because Johnson indicated he knew Bender, having dealt with him in the past. Accordingly, the "investigation" which the majority says Vanderlaan kept to himself was nonexistent. Simply stated, his cursory glance at the store's buy book did not disclose Johnson's name prior to the date here in question. Additionally, the filing deputy prosecutor indicated he was not concerned about Johnson's alleged past dealings with Bender. He checked out two office files and thus became concerned with Bender's having purchased rings stolen from a wholesale jeweler within a few days of the Johnson matter, and with another prior matter where one of Bender's employees had been charged with possession of stolen property. A material fact is one which if known by the prosecutor would have changed his conclusion of probable cause. This simply was not the case, and there is no testimony in that regard by any of the deputy prosecuting attorneys who reviewed this file before filing.

Second, the majority maintains Vanderlaan failed to provide copies of the documents in support of Bender's compliance with reporting procedures in the purchase of goods from Johnson. Indeed, Blacklow, the deputy prosecutor who filed the case, and Vanderlaan had a conversation about the fact that Bender's report had inconsistent prices (the prices were marked over) and an erroneous date (one transaction was listed, rather than two). That hardly substantiates Bender's propriety of the transaction argument.

Finally, the majority makes much of the fact that Vanderlaan did not advise the deputy prosecuting attorney that the disproportionate price paid by Bender compared with the actual value of the rings was not unusual for second-hand jewelry. We can assume deputy prosecuting attorneys who deal with these cases have some sophistication as to the real world. Further, the disproportionality of the price would be only one factor for the jury to consider in the larceny by possession case against Bender. Again, the materi-

ality of this fact escapes me.

The majority, while correctly stating the law that the gist of an action for malicious prosecution rests on malice as well as the lack of probable cause, fails to discuss malice. I conclude that there is simply nothing the majority can refer to in the record to establish that essential element. Malice has been defined as:

> "To constitute malice there must be *malus animus,* denoting that the party who instituted the original proceeding was actuated by wrong motives. And it is held that no distinction exists in this respect between an action for instituting a civil suit and an action for instituting a criminal prosecution. The rule is well settled that malice may consist of any personal hatred or ill–will, any improper or sinister purpose, or any reckless disregard of the rights of others, which is inconsistent with good faith or the mere purpose to further the ends of justice."

*Waring v. Hudspeth,* 75 Wash. 534, 538, 135 P. 222 (1913). The only evidence in the record which the majority may point to hardly rises to the level of malice. Vanderlaan testified that he did not totally believe Bender and did not seriously consider his golfing alibi for July 18, even though Bender had given a statement admitting that he had purchased the stolen goods on July 19. The officer testified: "I simply did not believe Mr. Bender because of the—the fact that he was very nervous and the fact that he also did not give us a total and complete statement right at the first time. In other words, he was very confused as to what had taken place, where he had been; and I just doubted him." This doubt was entirely reasonable because the statement which Bender finally gave the police officer was the third one he had written. He discarded the other two as his account of the events changed. Even so, the officer did attempt to check on Bender's story. He testified: "in the statement Mr. Bender told me that his help had bought the rings on the 18th of July. And I checked with Mr. Bender and asked him who is his help that purchased the rings on the 18th; and Mr. Bender said that he could not remember,

he had no idea, he had too many people working in his store to be able to tell me who the people were that bought the rings." Further, there is no duty on the part of a detective to investigate an alibi. Bender never came forward with any substantiation of his alibi during the investigation. The substantiation came during this trial only. In fact, the officer testified that Bender had never informed him about one particular phone call which may have helped to establish the alibi. So long as the prosecutor is aware that an alibi is claimed, as he was here, the police can seek the warrant without investigating and without liability for malicious prosecution. *See Christiansen v. Anderson,* 179 Wash. 368, 37 P.2d 889 (1934).

I conclude that plaintiff did not prove facts sufficient for a jury determination of lack of probable cause, nor did he produce a scintilla of evidence concerning malice. Thus the majority's result is totally unfathomable in this case. The majority simply does not wish to disturb a jury's determination. Yet that is exactly our function in a case such as this and we have not shirked this responsibility in the past. *Christiansen v. Anderson, supra; Pallett v. Thompkins,* 10 Wn.2d 697, 118 P.2d 190 (1941). In *Pallett* after a jury verdict rendered in favor of the plaintiff, our Supreme Court reversed the action for damages for malicious prosecution, maintaining that when "facts sufficient to establish probable cause are shown and are undisputed, then the court should declare, as a matter of law, that there was probable cause and dismiss the action. *Hightower v. Union Savings & Trust Co.,* 88 Wash. 179, 152 Pac. 1015 [(1915)]". *Pallett,* at 700. The majority in its reluctance to disturb a jury verdict on causes of action which should have been decided as matters of law leaves the police officers in a state of confusion as to what this court requires. The majority's obfuscated analysis of purported material facts—as opposed to disputed facts—which the officers failed to disclose can only thwart police officers and prosecutors in fulfilling their duties. The rule established here today appears to allow a lawsuit for false arrest and malicious prosecution any time

criminal charges are dismissed. A plaintiff, in order to go to a jury, need only recite at trial a fact—no matter how insignificant in the eyes of the prosecutor—which an officer, with total absence of malice, failed to disclose.

If probable cause did not exist as a matter of law in this case, it never will. I therefore dissent.

Since the jury verdict was not segregated as to the various claims, I would remand for trial the libel and/or slander action pursuant to the principles of law stated by the majority.

STAFFORD and DORE, JJ., concur with DIMMICK, J.